People of the State of Illinois, Defendant in Error, v. Frank Daniel, Plaintiff in Error.

Gen. No. 51,436.

First District, Fourth Division.

December 16, 1966.

Thomas J. McDonnell, of Chicago, for plaintiff in error.

Daniel P. Ward, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and Saul A. Perdomo, As-

sistant State's Attorneys, of counsel), for defendant in error.

MR. JUSTICE McCORMICK delivered the opinion of the court.

CHARGE: Murder.

JUDGMENT: After a bench trial the defendant was convicted of murder and sentenced to the Illinois State Penitentiary for a period of not less than 14 nor more than 19 years. Defendant sued out a writ of error in the Supreme Court, which transferred the case to the Appellate Court.

POINTS RAISED ON APPEAL: Defendant contends that he was denied a fair trial because:

1) He waived his right to a trial by jury without being properly and adequately informed of his rights;

2) He was prejudiced by the court allowing a witness to testify for the State whose name had never been furnished to the defense counsel who represented the defendant in the trial; and

3) His statement was improperly used to impeach him.

On January 25, 1962, the defendant voluntarily surrendered to the police and was taken into custody. The case came to trial on July 17, 1963.

EVIDENCE: Mrs. Georgia Mack, mother of the deceased, testified that after having lived downtown with the defendant for about a year and a half, her daughter, Dianne, had returned home two weeks prior to the date in question. She testified that on the evening of the shooting her doorbell rang at about 6:15, and that her daughter went to answer it. When she had not returned for some time, Mrs. Mack went to the glass porch door and saw her daughter running north. She further testified that she saw the defendant standing six to eight

318

steps from the front door, with a gun in his hand; that she saw him fire one shot; that she then went back into the house to call the police and while there she heard another shot; that she then went outside and found her daughter lying in the snow, about five houses north of her home. On cross-examination, the witness denied having any conversation with Frank Daniel on the day in question; that he was not in her home and did not bring a dress to her home that day.

Mrs. Sylvia McCurdy was then called as a witness by the State. The then defense counsel objected, claiming her name was not on the list of witnesses he had been given and he was taken by surprise. (Defendant had had two other counsel, each of whom had withdrawn before the appointment of the counsel who represented defendant during the trial.) The court allowed counsel two hours to interview the witness and overruled his objections asking that the testimony of the witness be excluded. Mrs. McCurdy testified that on the day in question she was sitting in a car parked two houses north of the Mack residence. She said she had known the deceased about seven years but had never seen the defendant before the day of the shooting. Her testimony continued as follows: While she was sitting in the car she saw the deceased run out of the house, followed by a man, then by Mrs. Mack. The deceased ran north and the defendant continued to pursue her, firing a gun four times. The deceased ran until she fell in front of a house about five doors north of the Mack home. The defendant then jumped into a car and sped away. On cross-examination Mrs. McCurdy stated that she had not seen the face of the defendant. She also said that she was still at the scene when the police arrived; that she did not talk to them nor did she go to the place where the deceased was lying; that the first time she ever talked about the matter was more than a week after the occurrence when she talked with Mrs. Mack.

Mrs. Mack was recalled by the State and testified that she identified her daughter's body at the morgue and that Dr. Tapia, coroner's pathologist, was present when the identification was made.

By stipulation the doctor's report of the cause of death was read into the record. The examination revealed that there was a bullet wound in the left lumbar region located at the level of the 12th rib; that the bullet was directed upward anteriorly and toward the left.

Police Officer Henry White testified that in response to a call he went to the 1800 block of Hartrey Street, where he saw the body of Dianne Anderson lying on the public sidewalk in front of 1829 Hartrey Street, her head to the north and her feet to the south. He stated that (on information received from the mother) he then made a search for the defendant and also for eyewitnesses. He further testified that the defendant surrendered in the police station on January 25, 1962, and gave the police a gun which he said he had used in the shooting. On cross-examination the officer testified that he did not find Mrs. McCurdy at the scene of the accident. He testified that Mrs. Mack had told him that the defendant had been in the house that day talking to her daughter, and that she did not tell him that anyone else except the defendant had come to the door or had talked to the deceased.

The defendant took the stand in his own behalf and testified that he had known the deceased since 1959; that he had been living with her since March 1959; that he had not at any time stopped living with her, and had been living with her at her mother's where she had been for about two weeks or more. He said Mrs. Mack had told him someone had tried to break into her back door. He testified that he got the gun in Indiana about 2 o'clock the day of the occurrence; that he had gone to Mrs. Mack's that day about 5:00 p. m., and had brought a black coat and a red dress for the deceased, together

320

with the gun. He testified that he and the deceased and her mother were sitting in the dining room having coffee when the front doorbell rang; that Mrs. Mack answered the bell, then returned to the dining room and told the deceased that someone wanted to see her. He stated that when the deceased went to the door he walked behind her, taking the gun, with him, and saw a man standing there; that the man grabbed the deceased and pulled her outside; that he (the defendant) came behind the man, put the gun on him and told him to turn her loose; that the man pushed her and she came up behind the defendant, the man got into an automobile and drove away. The defendant said he then asked the deceased who the man was and she told him she didn't know; that he turned to go back to the house and the deceased pushed him over and he fell, at which time the gun fired and the powder burned his face and he jumped up, thinking he was shot, and ran to the gas station. In response to a question as to how often the gun was fired, the defendant said he only heard one shot; that at the time it was fired he was lying on the sidewalk. He said he didn't intend to shoot the deceased. On cross-examination he testified that the deceased had been at her mother's for two weeks. The following questioning occurred:

Q. "And she wasn't with you during those two weeks?"
A. "I was up there."
Q. "You went up there?"
A. "Yes sir. I was with Mrs. Mack."
Q. "When you say you were with Mrs. Mack, what do you mean?"
A. "I had been up to Mrs. Mack for two weeks, we had been there, me and her both lived in the house, our apartment, and we went to Mrs. Mack after she had the—"
Q. "After what?"

A. "After Mrs. Mack said somebody else tried to break into her back door."

The defendant further testified that he had been at Mrs. Mack's house for about 45 minutes on the day in question. On cross-examination he testified that he didn't know whether the deceased went to turn around or had pushed him, and he slipped; he only knew that he fell and that was when the gun was fired. When asked how many times he fired the gun his response was that he heard only one shot and he didn't know whether or not there were more shots fired. He said that when he got up and left the deceased was still standing on the sidewalk. The defendant testified that at the time he was wearing a cap and a three-quarter length car coat.

For impeachment purposes the defendant was then questioned concerning a prior statement given by him to a prosecutor at the police station. The defendant denied making some of the statements to the prosecutor; he admitted that a court reporter took down the questions and answers. He was asked, concerning a former question:

"Were you asked this quesion:"

Q. "And when she was shot she fell right down at that spot?"
A. "I don't know whether she was standing up or she fell or what. I don't know when she was shot."
Q. "But she fell right where she was?" And did you answer: "She was laying right beside me when I got up."
A. "No, I didn't tell the State's Attorney that."
Q. "Did he also ask the question: 'She didn't get up when you did?' A. 'No, sir, she didn't get up when I was there.'"

The defendant denied that he was asked the questions or that he made the answers. All of these questions were

322

asked over his objection. A stipulation was entered into between the defendant and the State that if Donald Flannery were called to testify he would state that he is a stenographer for the State's Attorney's office and that on January 25, 1962, in the Evanston police station in the presence of an Assistant State's Attorney, and Officers White and Cooper of the Evanston police force, certain questions were asked of the defendant and certain answers given by him, and that he would further testify that at that time the defendant stated (referring to the alleged third person):

"A. He gets into his car. I say to her, 'Dianne, who was that?' She said, 'I don't know.' I said, 'I guess you do.' She said, 'No, I don't know,' and she pushed me. It's a small street, you know, and I slid down, I slid down and the gun went off, and how many times it was fired, I don't know. When I got up she was laying down, when the gun was firing on me and I couldn't see nothing, I couldn't see nothing. I looks at her. She was laying down and he started running. I don't know what to do because I thought I was shot and I went into the gas station. I told the guy I was shot and he also stated—

"Q. The question was when she was shot she fell right down at this spot, didn't she?

"A. I don't know whether she was shot and standing up or she fell or what. I don't know when she was shot.

"Q. She fell right where she was at?

"A. She was laying right beside me when I got up."

At that point counsel for defendant stated that he would object to the statement on the ground that it was involuntary and that there was no hearing on the statement. The court overruled the objection.

■■ OPINION: In this court the defendant urges that he had waived his right to a trial by jury without

323

being adequately informed of his rights. When the defendant appeared before the court the following colloquy occurred:

> Court: "Your counsel tells me that you want to waive a jury."
> Defendant: "Yes."
> Court: "You are entitled to a jury trial, if you want one."
> Defendant: "Judge, I prefer to have a bench [trial]."
> Court: "A bench trial?"
> Defendant: "Yes."
> Court: "All right. Sign the waiver."
> Mr. Stein: "He has signed the jury waiver, Your Honor."

In People v. Steenbergen, 31 Ill2d 615, 203 NE2d 404, where practically the same dialogue occurred between the court and the defendant, the court said:

> "A jury trial is a right and a privilege and is not a jurisdictional requirement. The duty of the court is to determine whether defendant knowingly and understandingly waived this right. People v. Wesley, 30 Ill2d 131; People v. Clark, 30 Ill2d 216; People v. Surgeon, 15 Ill2d 236."

The court held that from the excerpts from the record the defendant knowingly and understandingly waived his right to a trial by jury, and we so hold in the case before us.

The second contention made by the defendant is that the trial court abused its discretion in permitting Mrs. McCurdy to testify since her name was not on a list furnished to the then defense counsel; that the defense counsel was taken by surprise and the defendant prejudiced. Her name was on a witness memorandum appearing in the court file. The undisputed evidence tends to establish that the name of the witness, Mrs. McCurdy, had

been given to the preceding defense attorney. She had been subpoenaed and had appeared four times in court. The court, however, permitted the defendant two hours to interview the witness. After the interview the defendant again objected to the witness' testifying. The court overruled the objection and she was permitted to testify. It is within the court's discretion to allow witnesses to testify whose names do not appear on the indictment when by so doing the defendant is not placed at an unfair disadvantage. The burden of showing unfairness is on the defendant. People v. Quevreaux, 407 Ill 176, 95 NE2d 62; People v. Ford, 19 Ill2d 466, 168 NE2d 33. In People v. Welch, 22 Ill2d 558, 177 NE2d 160, the court said:

> "Although the statute directs the People to furnish to the defendant a complete list of witnesses, (Ill Rev Stats 1959, chap 38, par 729,) we have heretofore held the trial court may in its discretion allow unlisted witnesses to testify unless such a course unduly surprises or prejudices the defendant. However, where, as here, the defense was afforded an opportunity to talk to the witness, did not ask for a continuation or make any showing of prejudice, but proceeded with trial, no error resulted in such respect. People v. LaCoco, 406 Ill 303; People v. Weisberg, 396 Ill 412; People v. Scott, 261 Ill 165."

In the instant case the defendant was afforded an opportunity to talk to the witness for two hours, and proceeded with trial without asking for a continuance. This brings the matter directly under the rule laid down in the Welch case.

■■ The defendant further argues that a statement made by him on a prior examination by a State's Attorney was improperly used to impeach him. His counsel objected on the ground that the statement was involuntary and also on the ground that the defendant did not

make the statement. The State relied on People v. Hegovic, 348 Ill 58, 180 NE 561, and on the authority of that case the trial court ruled that it was not necessary to have a hearing to determine the voluntariness of the defendant's statement, when the defendant denied that he made the statement. However, subsequent to the instant trial, People v. Norfleet, 29 Ill2d 287, 194 NE2d 220, specifically overruled Hegovic. In the Norfleet case the court held that the due process clause of the Fourteenth Amendment invalidates a state court conviction grounded in whole or in part upon a confession which is the product of other than reasoned and voluntary choice; and further, that the point is available to defendant despite the fact that he testified in the proceeding that he had never in fact confessed, voluntarily or involuntarily.

In the case before us the State's Attorney filed a confession of error. People v. Stark, 33 Ill2d 616, 213 NE2d 503; People v. Thigpen, 33 Ill2d 595, 213 NE2d 534; People v. Taylor, 33 Ill2d 417, 211 NE2d 673; and Jackson v. Denno, 378 US 368, 84 S Ct 1774, 12 L Ed 908, all hold that the failure of the court below to conduct a hearing on the admissibility of the confession was error and that remandment for that purpose is required. However, it does not follow that this default of itself requires reversal of the conviction.

In accordance with the rule laid down in the foregoing cases, the cause before us is remanded to the Circuit Court of Cook County, with directions to conduct a hearing on the admissibility of the alleged statement of the defendant. If found to be admissible a new judgment of conviction should be entered. If found incompetent the judgment must be vacated and the defendant awarded a new trial.

Reversed and remanded with directions.

DRUCKER, P. J. and ENGLISH, J., concur.