241 A.2d 219.

STATE *vs.* CHARLES R. FRANKLIN.

APRIL 23, 1968.

PRESENT: Roberts, C. J., Paolino, Powers, Joslin and Kelleher, JJ.

JOSLIN, J. The defendant, an enlisted man serving in the Navy, was tried on a murder indictment before a justice of the superior court sitting without a jury. He was found guilty of murder in the first degree and sentenced to life imprisonment. The case is here on his bill of exceptions.

The victim, known as Ernie May, was killed in her own residence on the night of April 12, 1965, and her body was discovered at about 10 o'clock the following morning. Death was due to hemorrhage and six large wounds of the head and neck which apparently had been produced by a sharp-edged object such as an ax or hatchet. The police were called upon the discovery of the body. They immediately began their investigation, and by afternoon their suspicion had focused upon defendant. He was then apprehended and questioned at length. Although what he told the police was incriminating, at no time did he admit that he had killed the deceased. Nor did he sign any written statement. Upon completion of the investigation, defendant was charged with homicide, and in due course was indicted.

## I

When the case was called on November 8, 1965 before a justice of the superior court, both the state and defendant announced they were ready to proceed to trial. The defendant persisted in his previous plea of "not guilty" and, as the trial was about to get under way, he moved to proceed without a jury. His counsel advised the court that

he had fully explained to defendant "* * * what his rights are, referring to [§]12-17-3[1] of the General Laws of Rhode Island * * *" and stated further that "Franklin is intelligent enough to know what I am talking about and I only ask that in view of our Supreme Court decision that he state in open Court and respond to Your Honor that this waiver is done and made with his complete understanding and at his request." Thereupon, the trial justice inquired of defendant whether he understood that by waiving a jury trial, the court, rather than a jury, would hear the evidence, and that it, rather than a jury, would pass on the credibility of the witnesses and determine whether he was guilty or innocent of the crime charged. The defendant assured the trial justice that it was his "choice and * * * desire" to be tried without a jury, and, in response to a specific question, said that no promises or rewards had been made to induce his waiver. Thereupon, the trial justice granted the request, and the trial proceeded without a jury.

Now, having been found guilty by a judge, defendant argues that it was error to grant his request, that his waiver was invalid, and that he was denied his constitutional right to be tried by a jury. To argue that error inheres in a ruling which defendant himself requested would ordinarily not be permitted by our appellate procedures, which limit review to rulings to which exceptions have been properly preserved. *State* v. *Quattrocchi*, 103 R. I. 115, 235 A.2d 99, Here, however, the error assigned not only has constitutional implications, but by its very nature raises the question of whether or not there has been an intentional dis-

---

[1]Section 12-17-3 reads: "In all criminal cases the accused may, if he shall so elect and with the leave of the court, waive a trial by jury, and in such cases the court shall have jurisdiction to hear and try the cause without a jury and render judgment and pass sentence thereon. In cases so tried the court shall, upon request of the accused, make special finding upon any issue of fact and special ruling upon any question of law arising in the same."

regard of a procedural requirement. In the face of such claim, we will not invoke a procedural forfeiture, but will instead pass upon the claim, even though it is not rooted upon an exception to a ruling. *Henry* v. *Mississippi,* 379 U. S. 443, 452, 85 S.Ct. 564, 570, 13 L.Ed.2d 408, 415; *Fay* v. *Noia,* 372 U. S. 391, 438, 83 S.Ct. 822, 9 L.Ed.2d 837, 868; *State* v. *Dufour,* Joslin, J., concurring, 99 R. I. 120, 131, 206 A.2d 82, 88.

Unquestionably, defendant, in the exercise of his free choice, had the right to dispense with his basic constitutional right to a jury trial. That is settled law. *Adams* v. *United States ex rel. McCann,* 317 U. S. 269, 63 S. Ct. 236, 87 L. Ed. 268; *Patton* v. *United States,* 281 U. S. 276, 50 S.Ct. 253, 74 L. Ed. 854. The question is not then whether his right to a jury trial could be waived, but whether, within the purview of *Johnson* v. *Zerbst,* 304 U. S. 458, 58 S. Ct. 1019, 82 L. Ed. 1461, his relinquishment of that right was made knowingly, intelligently and voluntarily. The test to be applied was established in *Adams* v. *United States ex rel. McCann, supra,* where the supreme court said at 281, 63 S. Ct. at 242, 87 L. Ed. at 275:

> "* * * The *Patton* decision left no room for doubt that a determination of guilt by a court after waiver of jury trial could not be set aside and a new trial ordered except upon a plain showing that such waiver was not freely and intelligently made. If the result of the adjudicatory process is not to be set at naught, it is not asking too much that the burden of showing essential unfairness be sustained by him who claims such injustice and seeks to have the result set aside, and that it be sustained not as a matter of speculation but as a demonstrable reality. Simply because a result that was insistently invited, namely, a verdict by a court without a jury, disappointed the hopes of the accused, ought not to be sufficient for rejecting it."

Within the *Adams* standard, it is clear that defendant on this record has failed to sustain his burden of showing as a "demonstrable reality" and that he did not fully understand that he was giving up his right to be tried by a jury. That failure is fatal to his claim.[2] *Hatcher* v. *United States,* 352 F.2d 364; *Pool* v. *United States,* 344 F.2d 943; *Mc-Cranie* v. *United States,* 333 F.2d 307; *Hensley* v. *United States,* (D.C.) 155 A.2d 77; *Chislom* v. *Warden,* 223 Md. 681, 164 A.2d 912; *People* v. *Daniel,* 78 Ill. App. 2d 316, 223 N.E.2d 295.

## II

The police began their investigation of Ernie May's death on the morning of the 13th, and, at about 2 o'clock that afternoon, defendant was apprehended and brought to the police station. He was taken to an interrogation room where he was held incommunicado and continually questioned by several police officers until about 7 o'clock that evening. At that time, his request to see and talk to his wife, first made upon his arrival at the police station and several times thereafter repeated, was granted. Though perhaps not fully and definitively articulated, it is nonetheless implicit in the record that from the time of his apprehension he was the prime suspect upon whom the police inquiry had focused and that his custodial interrogation was purposed upon eliciting an incriminating statement.

Detective Sergeant Canole, who was the first officer to interrogate, testified that he told defendant before the questioning began "* * * that he had the right to refuse to answer any of my questions" and "* * * that he had the right to call an attorney of his own choice." The defendant's only response was that "* * * he wanted * * * to speak to

---

[2]In *People* v. *Nelson,* 17 Ill.2d 509, 162 N.E.2d 390, it was held that the requirement that an accused know the "consequences" which apply when he enters a plea of guilty has no application where he merely waives trial by jury.

his wife." Detective Walsh took over the questioning at about 4 o'clock, and defendant told him that he had been advised of his rights by Sergeant Canole. In addition, he "* * * continued to tell him [of] his rights, that he had the right to an attorney. He had the right to counsel. He could have his call, the use of the phone before I spoke to him. I also told him that anything that he said would be used against him."

Three other police officers also questioned defendant — Chief Radice, Captain Sullivan and Officer McKenna. The record does not disclose that they advised defendant of his "rights." It does, however, reveal that defendant stipulated at the time the Chief took the stand that he had "been apprised of his rights" prior to being questioned by the Chief.

Although defendant neither signed a confession nor made a direct admission of guilt, each of the interrogating police officers testified to incriminating statements he made during their respective in-custody interrogations. The defendant contends that those statements were inadmissible under *Escobedo* v. *Illinois,* 378 U. S. 478, 84 S. Ct. 1758, 12 L. Ed.2d 977, *State* v. *Dufour,* 99 R. I. 120, 206 A.2d 82, or *State* v. *Mendes,* 99 R. I. 606, 210 A.2d 50.

*Dufour* and *Mendes* do not apply. The defendant was interrogated on April 13, 1965, and the rights fixed in those cases extend only to persons questioned at least 30 days after May 10, 1965. *State* v. *Gannites,* 101 R. I. 216, 221 A.2d 620. It is otherwise, however, as to *Escobedo,* because the rights secured by that case are available to any person tried after the date on which it was decided, viz., June 22, 1964. *Johnson* v. *New Jersey,* 384 U. S. 719, 86 S. Ct. 1772, 16 L. Ed.2d 882. The defendant qualifies because his trial began on November 8, 1965, and the question becomes whether those rights are of assistance in the circumstances of this case.

*Escobedo* applies to a suspect upon whom an investiga-

tion has focused and who is being interrogated while in police custody for the purpose of eliciting incriminating statements; it entitles him to the opportunity, if requested, to consult with his lawyer, and it requires the police to warn him effectively of his absolute constitutional right to remain silent. Failure to comply with the *Escobedo* mandates means that any statement elicited by the police from an accused during such an interrogation may not be used against him at a criminal trial.

It is immaterial that the statement is oral and merely incriminating, rather than written and a direct admission or confession of guilt. The law treats the one the same as it does the other. This was made clear in *Miranda* v. *Arizona,* 384 U. S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694, when the court said at 476, 86 S. Ct. at 1629, 16 L. Ed.2d at 725: "The privilege against self-incrimination protects the individual from being compelled to incriminate himself in any manner; it does not distinguish degrees of incrimination."

The defendant did not at the trial, nor does he now, deny that at the outset of the interrogation he was advised that he had the right to call counsel and the right to refuse to answer any questions put to him; he did not at the trial, nor does he now, suggest that he did not fully comprehend the advice that he could call counsel would permit him at any stage of the interrogation to call and consult a lawyer of his own choice; he did not at the trial, nor does he now, contend that he did not fully understand the advice that he might refuse to answer questions contemplated that he had the absolute right to remain silent throughout the entire interrogation; he did not at the trial, nor does he now, argue that Sergeant Canole's advice that he could refuse to answer questions extended only to questions asked by the Sergeant and not to those of the four other interrogating police officers.

Instead, his argument, as we understand it, is that the

police in advising him of his right to seek counsel were merely reciting, as if by rote, his constitutional entitlements, and that their recital lost its substance and became ineffective by reason of their continuing refusal during the first five hours of his custody to allow him either to see or speak with his wife for the purpose of having her obtain counsel for him. We cannot agree that this was required by *Escobedo*. Whatever its implications or thrust, the supreme court in both *Miranda* and *Johnson* v. *New Jersey, supra,* made it clear that the extent of a suspect's right to counsel under *Escobedo* was an opportunity, upon request, to consult with his lawyer. It did not expand the constitutional safeguard of the right to consult to include an opportunity of a suspect to communicate with his wife so that she might obtain counsel for him. Nothing in *Escobedo* rendered inadmissible the incriminating statements defendant made to the police during his in-custody interrogation.

## III

The defendant also assigns as error the trial justice's refusal to appoint a psychiatrist to examine a key state witness with respect to his competency to testify. That request was made during the cross-examination of the witness when it first appeared that he had been confined in a mental hospital from March 29, 1946 to September 22, 1956. The defendant then argued, and he repeats that argument now, that the witness's mental illness, having been established, was presumed to continue until the state established the contrary. That, however, is not the operative presumption. Under our rule the witness was presumed to be sane until it was shown otherwise. *Mowry* v. *Saunders,* 33 R. I. 45, 52, 80 A. 421, 424; *Cole* v. *Barber,* 33 R. I. 414, 82 A. 129. That the witness may at a time 10 years prior to his appearance on the witness stand have been hospitalized for a mental illness was not enough standing alone to make him incompetent to testify.

What was determinative was not whether he was once mentally sick, but whether at the time he testified he had sufficient understanding to comprehend the obligation of his oath and had the capability to give a correct account of what he may have seen or heard in reference to the matters in issue. His qualification to testify under these tests was a matter on which the trial justice had considerable latitude, and much depended, of course, on the impression the witness made upon him. *Pierce* v. *New England Tel. & Tel. Co.*, 86 R. I. 326, 134 A.2d 421.

By the time defendant moved for the appointment of a psychiatrist the witness had testified at length, and the trial justice had been afforded by then a much broader opportunity to determine his competency than would have been available had the challenge come, as it usually does, when he first took the stand. He found nothing in the witness's demeanor and appearance which indicated that he was not mentally competent; he noted that his testimony was "reasonable and rational"; and, he concluded that his competency to testify had been fully established. In the face of those findings, it was not error to deny defendant's motion for the appointment of a psychiatrist to examine the witness.

## IV

The defendant also contends that the trial justice erred when he found that guilt of murder in the first degree had been established beyond a reasonable doubt. He devotes only slightly more than one page of his brief to this contention and nowhere in that limited statement of his position does he charge that the trial justice overlooked or misconceived any of the evidence, or that he drew any inferences which should not have been drawn, or that he failed to draw any inferences which should have been drawn, or that he used an incorrect legal yardstick in measuring the evidence. Instead, his position is narrow and limited. It

is as if he had said: "Even on the evidence which the trial justice accepted and the inferences which he drew, it was not established beyond a reasonable doubt either that I committed the homicide; or if I did kill Ernie May, that I acted so wilfully, deliberately, maliciously, and with such premeditation as to make me guilty of murder in the first degree."

The problem which defendant thus raises is whether on the evidence, most of it clearly circumstantial, the trial justice's decision was clearly wrong. He, of course, in determining guilt or innocence, had to find that all of the facts and circumstances necessary to the proof of the crime charged had been established beyond a reasonable doubt, and that taken together those facts and circumstances were consistent with the inference that defendant was guilty and at the same time were inconsistent with any reasonable theory or hypothesis that he was innocent. *State* v. *Montella*, 88 R. I. 469, 476, 149 A.2d 919, 922.; *State* v. *Blood*, 68 R. I. 160, 26 A.2d 745; *State* v. *DiNoi*, 59 R. I. 348, 368, 195 A. 497, 506.

The question whether the trial justice was clearly wrong, particularly when considered in the limited frame of reference in which defendant has posed it, does not require that we set out all of the facts and circumstances at length. Rather than attempt to recapitulate in detail, we refer only in a general way to the essential uncontradicted evidence and to the trial justice's most significant findings.

It appears that for some time prior to April 12 there had been an illicit relationship between defendant, a married man who lived with his wife and family in Newport, and Ernie May, also married and living in that city. Shortly before she was killed, a rift developed in their relationship and during the two weeks preceding her death, Ernie May refused to go out with defendant. Apparently her 17-month-old recently adopted child had become an obstacle

to her willingness to continue their relationship, and she was ready to bring it to an end. Defendant, at the same time, was feeling the pinch upon his limited finances of the cost of maintaining his own household as well as the rented room which he and Ernie May used as their meeting place. In addition, he anticipated that service disciplinary action might be taken against him because of the heavy debts he had incurred and was unable to meet. The combination of these pressures was such that the trial justice found they put defendant "* * * in that state of mind on or about April 12 when his world more or less is about to cave in on him."

Turning to the events of that day we find that the decedent was alive and in her own home at about 5:30 that afternoon. The defendant, on the same afternoon, was visiting a man named Jackson who resided at the same Pearl Street premises where defendant maintained the room which he and Ernie May used. He called her several times on the telephone, and when he received no answer to his last call, he left Jackson's apartment and went to her residence. It was then about 7:30 in the evening.

By his own testimony, he did not arrive until after she had been attacked. He found her lying on the floor in a pool of blood, and was unable to determine "* * * whether she was alive or dead * * *." Delaying only long enough to search, although without success, for the adopted child, who was nonetheless found in the house the next morning when the body was discovered, he then fled from the premises, leaving by the back door and through the rear yard. His explanation of why he ran away was, "Well, I mean, going with the woman and the woman laying down there like this and, I mean, er, I didn't want to be caught up in this stuff here. You know, I didn't know what happened. I couldn't explain what happened there so I didn't even want to be involved."

The cause of Ernie May's death was hemorrhage and six large chop wounds of the head and neck, the nature of which indicated that they had been produced by a sharp-edged object such as an ax or hatchet. While no direct testimony placed such an instrument in defendant's hands at the time of the killing, a hatchet which had mysteriously disappeared from Jackson's apartment was found in an automobile junkyard a short time after the killing. It bore no fingerprints. Jackson testified that he had last seen that hatchet on the day before the killing. He was then with defendant and the hatchet was in open view and lying on a chair in a room in his apartment. When he looked for it after hearing on the 13th of Ernie May's death, it was gone. The defendant, in addition to having been in Jackson's apartment on the 11th, had also been there just before he went to Ernie May's home on the 12th.

On the morning of the 13th, defendant, after morning quarters at the naval base, told a shipmate that he had heard that his "girl friend" had been killed, and that he knew the police were going to pick him up because the neighbors had seen him going-in and out of her house. On that morning, he sent the pea coat he had worn on the preceding day to the cleaners. It was torn at the lapel, some buttons were missing, and the right sleeve seam was stained with human blood. One of the shoes he had worn on the 12th was similarly stained.

In the early afternoon of the 13th defendant was apprehended by the police and at the outset of his custodial interrogation alibied that he had not been off the naval base after lunch on the 12th. He stuck with that story until he was confronted by the two persons with whom he had been drinking vodka at the Jackson apartment that afternoon. Then, for the first time, he admitted that he had been at Ernie May's residence on the night she was killed.

Based upon the foregoing facts and circumstances the

trial justice rejected defendant as a credible witness saying that his story tested "credulity" and was "unbelievable," and he determined that the proof established a connected chain of circumstances which convinced him beyond a reasonable doubt that defendant had killed Ernie May and had acted with malice aforethought for such an appreciable time as warranted a finding of first degree murder. We cannot say that his conclusion was clearly wrong.

## V

The remaining two grounds for reversal briefed and argued by defendant may be summarily dismissed.

The first is his contention that certain articles of his clothing, taken by the police while he was in their custody from what he claimed was his locker at the naval base, should not have been admitted into evidence as exhibits because they were products of an unlawful search and seizure. We reject that argument on procedural, rather than substantive, grounds. Since the exhibits came in without objection, the trial justice was not called upon to rule on their admissibility. Absent such a ruling coupled with an exception, there is nothing for us to review, it being our long-settled rule that a contemporaneous objection, or at least a motion to strike, plus a ruling and an exception are prerequisites to review. The requirement is designed both to alert the trial justice's attention to the issue raised and to insure a record on appeal which will focus on precise questions. It provides an orderly means for adjudicating criminal matters and thereby serves a legitimate purpose. Failure to comply with the rule will, in the ordinary case, preclude review in this court. *State* v. *Quattrocchi,* 103 R. I. 115, 235 A.2d 99; *State* v. *Ruggiero,* 93 R. I. 241, 174 A.2d 555; *State* v. *Arnold,* 64 R. I. 355, 12 A.2d 401.

Here, however, defendant's claim is that the evidence which was admitted was constitutionally inadmissible. If his claim has merit, then a mere procedural default should

not foreclose the right to have it considered, unless, of course, he deliberately bypassed our contemporaneous objection rule. *Henry* v. *Mississippi*, 379 U. S. 443, 452, 85 S. Ct. 564, 13 L. Ed.2d 408, 415; *Fay* v. *Noia*, 372 U. S. 391, 438, 83 S. Ct. 822, 848, 9 L. Ed.2d 837, 868; *State* v. *Dufour*, Joslin, J., concurring, 99 R. I. 120, 131, 206 A.2d 82, 88. Whether in fact there is a constitutional question, and, if so, whether our procedural requirements were intentionally bypassed, are questions which cannot be answered on the limited record before us. All it discloses is that some of the articles of clothing admitted as exhibits were taken from a locker at the naval base. For us to attempt to pass judgment on such a record would be to decide the constitutional question in a vacuum. Justice could not be done either to defendant or to the state. We expressly refrain at this time, therefore, from passing on defendant's claim, noting, however, that we do not foreclose defendant from seeking vindication by appropriate post-conviction proceedings.

Next is defendant's contention that it was error to deny his motion to dismiss the indictment. Such a motion, if made, as was this one, at the conclusion of the state's case without defendant first resting his case, is addressed to the trial justice's discretion. No exception lies to its denial. *State* v. *Terranova*, 73 R. I. 149, 54 A.2d 407; *State* v. *Kozukonis*, 71 R. I. 456, 46 A.2d 865; *State* v. *McElroy*, 71 R. I. 379, 46 A.2d 397.

The defendant in his bill of exceptions lists 49 separate exceptions. We have considered those having any relevance to the issues which he briefed and argued as grounds for reversal. Those having no such relevance are deemed to have been neither briefed nor argued.

Those of defendant's exceptions which he has briefed and argued are overruled, those not briefed or argued are deemed

to have been waived, and the case is remitted to the superior court for further proceedings.

Motion for leave to file motion for reargument denied.

*Herbert F. DeSimone,* Attorney General, *Donald P. Ryan,* Assistant Attorney General, *Luc R. LaBrosse,* Special Assistant Attorney General, for plaintiff.

*James Cardono,* Public Defender, for defendant.