STATE

v.

Jose LOPEZ.

No. 90–170–C.A.

Supreme Court of Rhode Island.

Dec. 7, 1990.

John J. Hogan, Sp. Asst. Atty. Gen., Providence, for plaintiff.

Susan Iannitelli, Iannitelli Law Offices, Providence, for defendant.

## OPINION

FAY, Chief Justice.

This case comes before us on appeal by the defendant, Jose Lopez (Lopez), from a Superior Court jury conviction of first-degree murder, assault with intent to commit murder, and conspiracy to commit murder. The defendant alleges error by the trial justice in three instances: (1) the trial justice abused his discretion in failing to consider the effect of a witness's psychosis on her testimony when denying the defendant's motion for new trial, (2) the trial justice abused his discretion by failing to consider the voluntary flight of the codefendant from the courtroom when denying the defendant's motion for a new trial, and (3) the trial justice abused his discretion in twice denying the defendant's motions to pass and to sever. For the reasons stated herein, we sustain the convictions of the defendant.

At approximately 8:45 on the evening of March 13, 1987, the body of a woman was found lying in the street near the intersection of Barbara and Bowlet Streets in the city of Providence. The woman, the victim of a shooting, was subsequently identified

as Clara Aguila (Aguila), known also as Clara Aguila–Jimenez and Rosa Maria Gonzalez. A few blocks away on Dresser Street, at approximately the same time, the body of another woman was found. This second woman, also the victim of a shooting, was subsequently identified as Reyna Martinez–Marchado (Martinez–Marchado), also known as Dulce Montoya.

Both victims were taken to Rhode Island Hospital. Aguila was treated for gunshot wounds to the left shoulder, left thigh, and left hand and was subsequently discharged from the hospital on March 17, 1987. Martinez–Marchado's injuries, however, were more serious.

Martinez–Marchado arrived at Rhode Island Hospital with no vital signs. Although workers were able to resuscitate her, she died approximately three hours later. An autopsy revealed that Martinez–Marchado had died as the result of a gunshot wound, fired from close range, to the back of her head.

In the days following the shootings Aguila described to police how she had been shot by a man whom she knew as "Pepin," while they were riding in a car driven by Pepin's nephew, "Felo." Aguila was shown two different sets of photographs by the Providence police. From these photo arrays she identified photographs of the men she had known as Pepin and Felo.

Subsequently, Pepin was identified as Jose Lopez, and Felo was identified as Rafael Vasquez (Vasquez). Lopez and Vasquez were indicted and tried together before a jury of the Superior Court in March 1989. Lopez was convicted of first-degree murder in the death of Martinez–Marchado, of assaulting Aguila with intent to commit murder, and of conspiring to commit murder. Vasquez was convicted of aiding and assisting Lopez to commit the murder of Martinez–Marchado, of aiding and assisting Lopez in assaulting Aguila with the intent to commit murder, and of conspiring to commit murder.

Aguila testified at trial about the chain of events that culminated in the shooting of herself and Martinez–Marchado. According to her testimony, on the morning of March 13, 1987, the Providence police responded to a call from 69 Adelaide Avenue and spoke with Martinez–Marchado. At some point Martinez–Marchado invited the police into the house and took them to an apartment on the second floor. Once inside the apartment Martinez–Marchado handed over to the Providence police money and crack cocaine that had been hidden in the apartment's refrigerator. No arrests were made, but the police confiscated the crack and money.

The crack and money that Martinez–Marchado gave the police belonged to defendant. The defendant was not at the apartment when the police were there on the morning of March 13, 1987. Upon his subsequent arrival at Adelaide Avenue and his discovery that his crack and his money were missing, defendant became enraged. He argued with Aguila and threatened to kill her. Aguila testified that at one point during this argument defendant fired a shot at her while she was lying in bed. The bullet sailed over Aguila's head and lodged in the bed's headboard.

The defendant eventually left the apartment and ordered Aguila to remain there. Approximately two hours later defendant returned to the Adelaide Avenue apartment. At this time defendant took Aguila to the home of Juana Lorenzo (Lorenzo). While at Lorenzo's home, defendant repeatedly beat Aguila over the head and on the knees with a gun, breaking the skin. Lorenzo testified that defendant told her that he was beating Aguila because he believed Aguila and others from the Adelaide Avenue apartment had stolen his crack and money.

Thereafter defendant brought Aguila back to the apartment on Adelaide Avenue. Once again defendant left, ordering Aguila to remain in the apartment. Upon his return defendant dragged Aguila from the apartment and put her into a car.

Aguila testified that she was forced into the car and onto the front seat. Also in the car and sitting in the front were Vasquez, who was driving, Martinez–Marchado, who was seated to the right of Vasquez, and Jorge Fresneda (Fresneda), who was seated

to the right of Martinez–Marchado. The defendant sat alone in the back of the car. Aguila testified that as the group drove around Providence, she noticed that Vasquez had a gun and that defendant had two guns. Aguila further testified about a brief conversation between defendant and Vasquez. Vasquez asked defendant, "Pepin, shall we kill them here?" In response defendant answered, "No. Go ahead a little bit more, drive a little bit more."

A short distance later and while still inside the car, defendant shot Aguila in the back. Aguila stated that she knew it was defendant who had shot her because before having fired, defendant had told her he was going to kill her. After having been shot the first time, Aguila testified, she heard defendant ask Vasquez if she was still breathing. When Vasquez said she was, defendant shot Aguila again.

After shooting Aguila the second time, defendant again asked Vasquez if she was still breathing. This time Aguila held her breath, and Vasquez told defendant, "[S]he's dead already." At this point defendant told Fresneda to throw Aguila out of the car. While the car was still moving, Fresneda threw Aguila out onto the street. Soon after being thrown from the car, Aguila heard gunfire close by.

Fresneda testified at the trial that he was present in the car when both Aguila and Martinez–Marchado were shot. Fresneda's testimony substantially corroborated the testimony of Aguila. Fresneda testified that there was arguing centering on the missing crack and money that Martinez–Marchado had turned over to the police earlier that day.

Fresneda testified that defendant had shot Aguila first and that he, Fresneda, had opened the passenger's side door and pushed Aguila out of the car. Fresneda further testified that a few blocks away, defendant shot Martinez–Marchado. Once again Fresneda threw the body out of the car through the open door on the passenger's side.

## I

The defendant's first argument alleges that the trial justice erred in denying defendant's motion for a new trial by failing to consider the effect Aguila's mental illness had on her testimony. In addition, defendant argues that because of Aguila's mental illness he was deprived of his right to confront her testimony as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and article I, section 10, of the Rhode Island Constitution.

During the course of her testimony, Aguila stated that she was currently under the care of psychiatrists. On cross-examination she admitted that during the summer of 1986 she was hospitalized on an inpatient basis at a psychiatric hospital in New Jersey. She further testified that because of her mental illness she suffers from memory lapses.

Aguila also admitted on cross-examination that at times she hears voices. She testified that in July 1988 she told a therapist that she was receiving messages from a television set. These messages were telling her that her daughter was being abducted. At another point during cross-examination Aguila refused to answer a question put to her by defense counsel because, according to Aguila, defense counsel was "mixing up my mind; making me sick."

Upon further cross-examination Aguila testified that she knew Martinez–Marchado was also known as Dulce Montoya. She testified that in June 1987, three months after the shootings, she told a social worker in New Jersey that Dulce Montoya was going to care for her child until she could find an apartment. When asked by defense counsel whether it was true that Dulce Montoya had been killed three months prior, Aguila stated, "Dulce Montoya's not dead * * * She's alive * * * The one that died was Reyna Martinez." Defense counsel again asked Aguila whether Reyna Martinez and Dulce Montoya were the same person, and she admitted they were.

"The standard for appellate review of a trial justice's ruling on a motion for a new

trial is that such ruling is entitled to great weight and will be disturbed only if the trial justice overlooked or misconceived material evidence or was otherwise clearly wrong." *State v. Henshaw*, 557 A.2d 1204, 1207 (R.I.1989); *see State v. Girouard*, 561 A.2d 882, 890 (R.I.1989). This court has set forth at least three analyses a trial justice should undertake when ruling on a motion for a new trial. *Girouard*, 561 A.2d at 890–91.

"The first analysis is to consider the evidence in light of the charge given the jury which charge is presumably correct as to the law and fair to the defendant." *Id.* "The second analysis is for the trial justice to determine his or her own opinion of the evidence: what weight and credibility does he or she give to the witnesses and other evidence, and what conflicting testimony and evidence does the trial justice accept or reject." *Id.* at 891. "The third analysis is whether if in his or her independent assessment of the evidence and in light of the charge to the jury, the trial justice determines that he or she would have reached a different result than the jury reached." *Id.* A fourth analysis is necessary only when the "trial justice differs with the jury." *Id.*

The record reveals that in ruling on defendant's motion for a new trial, the trial justice properly undertook the analyses as set out above. First, the trial justice summarily examined the testimony given by each witness at trial. The examination of the evidence by the trial justice was done in light of the charge to the jury that defendant must be proven guilty beyond a reasonable doubt.

■ Second, the trial justice stated that he accepted and gave full weight to the testimony of most of the witnesses, specifically including the testimony of Aguila. The trial justice further stated that he accepted most of the testimony of Lorenzo and Fresneda and found them essentially credible. Although it is true that the trial justice did not explicitly refer to Aguila's mental illness in ruling on defendant's motion for a new trial, it is equally true that in making such a ruling, the trial justice

"need not place an exhaustive examination in the record" of the material evidence that he or she has considered. *Girouard*, 561 A.2d at 891.

Next the trial justice stated that the jury verdicts did substantial justice and that had this case been tried without a jury, the verdicts would have been the same. Finally, because the trial justice did not differ with the jury in his independent assessment of the case, the fourth analysis was unnecessary.

The additional allegation by defendant that because of Aguila's mental illness she was incompetent to testify and he was therefore denied his right to cross-examination, as guaranteed under the Sixth and Fourteenth Amendments to the United States Constitution and article I, section 10, of the Rhode Island Constitution, is meritless.

■ Rule 601 of the Rhode Island Rules of Evidence sets forth the general rule for competency of witnesses. Rule 601 states, "Every person is competent to be a witness except as otherwise provided in these rules or by statute." Pursuant to Rule 601, witnesses are presumed to be sane until proven otherwise. *State v. Franklin*, 103 R.I. 715, 723, 241 A.2d 219, 225 (1968). The determinative factor regarding the competence of a witness to testify is "not whether he was once mentally sick, but whether at the time he testified he had sufficient understanding to comprehend the obligation of his oath and had the capability to give a correct account of what he may have seen or heard in reference to the matters in issue." *Id.* at 724, 241 A.2d at 225.

■ In the case at hand the competence of Aguila to testify was never challenged. Defense counsel was well aware of Aguila's history of mental illness before trial. There was ample opportunity to challenge her competency, but the decision was made not to do so. For these reasons, we must presume Aguila was competent to testify.

■ The Sixth and Fourteenth Amendments to the United States Constitution and article I, section 10, of the Rhode Is-

land Constitution guarantee criminal defendants the right to confront witnesses against them. *See State v. Parker*, 566 A.2d 1294, 1294–95 (R.I.1989). "[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Id.* at 1297 (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S.Ct. 292, 294, 88 L.Ed.2d 15, 19 (1985) (per curiam)).

In the instant case Aguila was cross-examined at length. Throughout the cross-examination defense counsel repeatedly attacked her credibility. In spite of this the trial justice found Aguila's testimony credible and gave it full weight.

■ We are of the opinion that defendant was not denied his right of confrontation by cross-examination of Aguila. In addition the trial justice undertook the correct analyses in ruling on defendant's motion for new trial. The record does not reveal any abuse of discretion or misconception of material evidence by the trial justice. For the reasons stated, defendant's motion for a new trial premised upon Aguila's mental illness was properly denied.

## II

The defendant's second argument alleges that the trial justice erred in denying defendant's motion for a new trial by failing to consider the voluntary flight of Vasquez from the courtroom. Additionally defendant alleges that Vasquez's flight was the equivalent of a statement and that he was unfairly prejudiced by it because he was unable to confront possible inferences arising from this alleged statement.

During cross-examination Fresneda testified that he was an unwilling participant in both the murder of Martinez–Marchado and the shooting of Aguila. He stated that at the time of the incident he knew defendant was upset over the loss of his money and drugs. Fresneda further testified that defendant, seated alone in the rear of the car, had a gun aimed at the passengers

sitting in the front of the car. Shortly after this testimony the court recessed.

Upon returning from the midday recess, codefendant Vasquez failed to return. The trial justice excused the jury for the remainder of the day and instructed trial counsel to attempt to locate Vasquez. When court reconvened the following morning, Vasquez had still not returned. After questioning counsel concerning efforts made to locate Vasquez, the trial justice stated that he was satisfied that the absence was voluntary and as a result deemed it a waiver by Vasquez of his right to be present at trial.

When the jury was brought back into the courtroom, the trial justice gave the following cautionary instruction: "Good morning ladies and gentlemen. As you can see, defendant Rafael Vasquez is not in court this morning. The trial will proceed in his absence and you are not to concern yourself with the reason for his absence." The trial then resumed without Vasquez.

■ When ruling on a motion for a new trial, the trial justice must "consider all the material evidence in light of his or her charge to the jury." *Henshaw*, 557 A.2d at 1207–08. Defense counsel readily admits in its appellate brief that the absence of Vasquez was not an issue of sworn testimony. Defense counsel further concedes that the prosecution did not at any time during the remainder of the trial comment upon the absence of Vasquez.

■ In spite of this, defendant cites *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), as support for his argument that the voluntary flight of his codefendant was material evidence. In *Bruton* the confession of Bruton's codefendant was admitted into evidence through the testimony of one of the government's witnesses. *Id.* at 124, 88 S.Ct. at 1621, 20 L.Ed.2d at 478. This confession also implicated Bruton. *Id.* Because Bruton's codefendant did not testify, the part of his confession implicating Bruton was not subject to cross-examination. *Id.* at 127–28, 88 S.Ct. at 1623, 20 L.Ed.2d at 480. The court did, however, instruct the jury that the evidence of the confession

could only be used against Bruton's codefendant and not against Bruton himself. *Id.* at 124–25, 88 S.Ct. at 1621–22, 20 L.Ed.2d at 478.

The case at bar differs substantially from *Bruton* in that no testimony was heard regarding Vasquez's voluntary flight from the courtroom. Additionally Vasquez's absence was not commented upon following his disappearance. The trial justice properly and promptly instructed the jurors not to concern themselves with Vasquez's absence. Unlike the obvious prejudicial effect of actual testimony affirmatively admitted in *Bruton*, Vasquez's voluntary flight in the case at bar did not prejudice defendant or imply that he was guilty.

The additional allegation by defendant, that the flight of Vasquez was the equivalent of a statement that unfairly prejudiced him because he was unable to confront possible prejudicial inferences arising therefrom, carries no weight.

██ The defendant asks this court to treat the voluntary disappearance of Vasquez as a statement under Rule 801(a) of the Rhode Island Rules of Evidence. Rule 801(a) defines "statement" as "(1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion." It is clear that Vasquez's disappearance was neither a written nor an oral assertion and therefore does not fall within the parameters of Rule 801(a)(1). The only way Vasquez's disappearance could possibly be construed as a statement would be pursuant to Rule 801(a)(2). Rule 801(a)(2) specifically requires that a person intend his or her nonverbal conduct to be an assertion.

In the case at hand there is nothing whatsoever to support an inference that Vasquez intended his conduct to be an assertion of any kind. Nothing in the record reflects that Vasquez intended to cast any consciousness of guilt upon defendant through his action or that the jury inferred such themselves. Finally, we have no reason to believe that the jurors did not faithfully carry out the cautionary instruction given them by the trial justice.

Because no evidence was presented at trial regarding the voluntary flight of Vasquez and because such voluntary flight, based solely upon the facts of this case, was not a statement under Rule 801(a), the trial justice did not overlook material evidence and properly denied defendant's motion for a new trial.

### III

The defendant's third argument alleges that the trial justice erred in twice denying defendant's motions to pass and to sever. In addition defendant argues that the single cautionary instruction given the jury following Vasquez's flight did not adequately protect him from prejudicial inferences possibly drawn by the jury.

The first motion to pass and sever made by defendant came during the cross-examination of Fresneda by Vasquez's counsel. The motion was made after the following dialogue between Fresneda and counsel for Vasquez.

"Q Counsel: And you knew that 'Pepin' was quite upset over the loss of the drugs and the money?

"A Fresneda: Yes.

"Q Counsel: Is it that you claim 'Pepin' had a gun on all of you from the back seat?

"A Fresneda: Yes."

According to defendant's counsel, this exchange created a situation in which defendant was then facing dual prosecution, from the state as well as from Vasquez's counsel.

██ The granting or the denial of severance is an issue that rests within the sound discretion of the trial justice. *State v. Cassey*, 543 A.2d 670, 673 (R.I.1988); *State v. Clarke*, 448 A.2d 1208, 1209 (R.I. 1982). A defendant does not have an automatic right to severance. *Cassey*, 543 A.2d at 673; *Clarke*, 448 A.2d at 1209. The denial of a motion to sever will not be reversed by this court unless it is clear that the trial justice abused his or her discretion. *Cassey*, 543 A.2d at 673. "The defendant must affirmatively show that in fact he has suffered prejudice as a result

of the joint trial to the extent that it has impinged upon his right to a fair trial." *Id.*

■■■ Likewise a motion to pass a case is within the sound discretion of the trial justice. *State v. Mastrofine,* 551 A.2d 1174, 1177 (R.I.1988). Denial of a motion to pass is accorded great weight. *Girouard,* 561 A.2d at 890; *Mastrofine,* 551 A.2d at 1177. This court will not overturn the trial justice's denial of a motion to pass unless the decision was clearly wrong. *Girouard,* 561 A.2d at 890; *Mastrofine,* 551 A.2d at 1177.

■■■ Relying on the record before us, we believe that the trial justice did not abuse his discretion in denying defendant's motion to pass and sever premised upon the testimony of Fresneda. The case at hand is unlike *Clarke* wherein one defendant chose not to testify while the other defendant did testify, denied responsibility, and implicated the other. *See State v. Clarke,* 448 A.2d 1208 (R.I.1982). In the instant case neither defendant nor Vasquez testified. The record reflects that the testimony of Fresneda was limited to his own beliefs and state of mind. The defendant has not shown that the joint trial prejudiced him so as to deny him a fair trial; therefore, defendant's first motion to pass and sever was properly denied.

■■■. The second motion to pass and sever was made by defendant's counsel after Vasquez fled the courthouse during a recess and did not return. As grounds for the motion, defendant's counsel argued that because of Vasquez's absence from the courtroom, the jury could draw conclusions unfavorable to defendant. Specifically defendant's counsel argued that the jury could infer that Vasquez's absence was caused by Vasquez's fear of defendant. Additionally because marshals were present during the trial and Vasquez was now gone, defendant's counsel argued, it would be obvious to the jury that defendant was the one being held in custody. According to defendant's counsel, no cautionary instruction could possibly cure this prejudice.

In denying defendant's motion, the trial justice stated that he was prepared to give the jury a cautionary instruction. A cautionary instruction, quoted earlier within this opinion, was promptly given. Relying on the standards set forth above, we are of the belief that the trial justice did not abuse his discretion in denying defendant's motion to pass and sever following Vasquez's voluntary flight. It appears that the trial justice believed any prejudice that may have arisen because of Vasquez's absence could be cured by a cautionary instruction. Such instruction was promptly given. We are of the opinion, therefore, that defendant has not shown the type of prejudice that would raise his denial of the motion to pass and sever to the level of abuse of discretion.

The defendant's final argument alleges that because the trial justice did not give an additional cautionary instruction to the jury during his charge regarding Vasquez's flight, he was denied a fair trial because of possible prejudicial inferences the jury may have drawn as a result of Vasquez's absence. In support of this position defendant cites *State v. Ouimette,* 110 R.I. 747, 298 A.2d 124 (1972).

In *Ouimette* the state affirmatively offered evidence of pretrial flight of the codefendant Sweet. *Id.* at 773, 298 A.2d at 139. The evidence was offered by the state as circumstantial evidence of Sweet's guilt. *Id.* at 774, 298 A.2d at 139. The trial justice instructed the jury, both at the time the evidence was presented and during the charge, to consider the evidence of flight solely against Sweet and not against Ouimette. *Id.* at 774, 298 A.2d at 139–40.

The case at bar is distinguishable from *Ouimette* in that the state did not affirmatively offer evidence of a codefendant's flight. Vasquez left the courthouse voluntarily. Promptly after Vasquez's flight, the trial justice instructed the jury to disregard his absence. Nothing in the record indicates that the jury was incapable of following the trial justice's cautionary instruction. Absent such indications this court will assume that the jury properly

followed the instruction as told. *State v. Powers*, 566 A.2d 1298, 1304 (R.I.1989).

We are of the opinion that the trial justice's original cautionary instruction was sufficient and that his failure to instruct the jury again in his charge did not have such a prejudicial effect as to deny the defendant a fair trial.

For the aforementioned reasons the defendant's appeal is denied and dismissed, the judgment appealed from is affirmed, and the papers in this case are remanded to Superior Court.