JOHNSON *v.* STATE OF INDIANA
[No. 26,320.   Filed March 14, 1935.]

*Robert Lee Brokenburr*, and *R. L. Bailey*, for appellant.

*Philip Lutz, Jr.*, Attorney-General, and *Caleb J. Lindsey*, Assistant Attorney-General, for appellee.

HUGHES, J.—The appellant, John F. Johnson, and Ernest Martin and William Singleton were indicted for conspiracy to commit a felony. Johnson and Martin were convicted, and Singleton was acquitted. Johnson was sentenced to the State Prison and Martin was given a suspended sentence.

The assignment of error is that the court erred in overruling appellant's motion for a new trial. The motion for a new trial assigns four reasons, which are as follows: (1) The decision of the court is contrary to law; (2) the decision is not sustained by sufficient evidence; (3) the third and fourth reason relate to objections sustained by the court to the admission of certain evidence.

The indictment was as follows:

"The grand jurors for the County of Marion and State of Indiana, upon their oaths, present that JOHN F. JOHNSON, ERNEST R. MARTIN, and WILLIAM SINGLETON, on or about the 1st day of April A. D. 1932, at and in the County of Marion and state aforesaid, did then and there unlawfully, knowingly and feloniously unite, combine, conspire, confederate and agree to and with each other, for the object and purpose and with the unlawful and

felonious intent to unlawfully, feloniously, forcible, by violence and putting Alice Ferguson and Marcia Murphy in fear, rob, take and steal from the person and possession of the said Alice Ferguson and Marcia Murphy, money, the value of which is to the grand jurors unknown, which money the said Alice Ferguson and Marcia Murphy then and there unlawfully held in their possession and was then and there the property of the State of Indiana, contrary to the form of the statute in such case made and provided and against the peace and dignity of the State of Indiana."

It appears from the evidence that the appellant was an employee in the license branch of the Secretary of State's office in the State House in the months of January and February, 1932, and had been for some time; that Miss Alice Ferguson and Mrs. Marcia Murphy were also employed in the same office acting as cashiers in in the Auto License Department; that a large amount of money accumulated in said office, and especially on Monday for the reason that the money received on Saturday was not banked until Monday; that as much as $30,000.00 would be in the office on Monday morning. The evidence further shows that the appellant would be in and out of the office where Miss Ferguson and Mrs. Murphy were, but not in the cage with them where the money was; that the money was visible and easily seen by any one in the office; that the appellant at various times took application for licenses to the cashier's office and transacted other business relating to his duties there. The evidence further shows that the Auto License Department is in the southeast part of the basement of the State House, and that the State Treasurer's office is on the second floor and in the southwest part thereof.

The theory of the State is that there was a conspiracy by the appellant and Singleton and Martin to rob Miss Ferguson and Mrs. Murphy who had charge of the

money in the Auto License Department, and it is so alleged in the indictment.

The alleged co-conspirator, Singleton, who was acquitted, testified that on or about February 10, 1932, he went to appellant's office, at the request of the appellant, and that the appellant asked him—"How would you like to get in on some easy money?" And in response to the question by Singleton, "What do you mean?" The appellant said, "Well, some big money, I got it. "Hold up the State House—The Secretary of State." Singleton said: "I can't do that." Singleton further testified that he saw the appellant again on February 11, 1932, with the other alleged co-conspirator and the three went to appellant's home and he again talked to Singleton and Martin about holding up the State House; that the appellant had a map drawn showing how to get in and out of the State House; that he saw appellant again on Sunday night, and that he again went over the plans and told him to meet Martin at a certain place on Monday morning, February 15th—"that it will have to be done between 8 and 9 o'clock," that he told Singleton if he didn't have a gun he would get one for him. Singleton further testified that he never at any time agreed or consented to the proposition submitted by appellant, and that Martin said nothing. It further appears that Singleton did not go to the State House on Monday and neither did he meet Martin.

It further appears from the State's evidence that the appellant, on or about February 10, was at the room of Ernest Martin, co-defendant, and that Leon Taylor, Robert Martin, and Ernest Martin were present; that appellant asked them if they would like to make some easy money; that he told them about the State House hold-up and drew some plans; that Taylor and Robert Martin said they didn't want to have anything to do

with it and that Ernest Martin didn't say anything. Robert Martin's evidence corroborated to a large extent the evidence just set out.

Cecil Vorhies, a witness for the State testified that on the night of Jan. 30 at the residence of Ernest Martin he met the appellant; that Dallas Bradford and Ernest Martin were also there; that Martin told them that a man would be there to submit a proposition; that the appellant later came and that he told them of the proposed State House robbery; that the appellant had a drawing showing how to get into the State House; that he directed us how to get in the Treasurer's Office. The witness further testified that none of them agreed to hold up the State House and that Martin didn't say anything, but later modified this by saying Martin said that "we wasn't to be yellow about this matter, that the pistols would be furnished by Johnson."

Bradford, a witness for the State, testified, in substance, the same as Vorhies.

Ernest Martin, alleged co-conspirator, testified in behalf of the State and stated that he knew the appellant and had worked for him, doing various errands, such as driving his car, and in driving appellant's sister-in-law to church. He further testified that on about January 25th, appellant asked him "if he wanted to make some easy money?" He said the State House was ready to be robbed; that there would be about $50,000.00 of automobile license money about February 1, which was pay day; that he, Martin, said, "the State House was not for any body to be monkeying around with;" that the appellant told me to think it over and asked me if I knew of any boys I could trust. That he came to his apartment and met Bradford and Vorhies and told them of his proposition to rob the State House; that he drew plans of the southwest part of the main floor and ex-

plained how to get into the Treasurer's Office; that he named Mr. Storen as Treasurer, and said the money would be in there on the table between 8:30 A. M. and 9:00 A. M. o'clock; he said there would be three people in the office, two women and one man. He further testified that he and the witness Singleton later met at appellant's house, and that he again went over the proposition of robbing the State House, and that again on February 11th, he and Singleton and Martin were together in an automobile when appellant again discussed the proposition. He also testified that he and Singleton and appellant were together on Sunday night, February 14th, and the proposition was again discussed. Martin further testified that he never agreed to rob the State House, and never had any intention to do so and that he never heard Singleton say or agree to do so, but did hear him say it would be suicide to try to do so. He further testified that he made no arrangements on Sunday night or Monday morning to rob the State House; that on Monday morning, he met appellant, as usual, at the corner of Capitol Avenue and Indiana Avenue and drove him to the back end of the State House, and then took appellant's car and took his sister-in-law to where she worked; that he did this every morning and had been for two months.

The appellant testified that he never at any time conspired, confederated, or agreed with Singleton or Martin to rob the Secretary of State's Office, or Alice Ferguson or Marcia Murphy. He denied ever meeting Vorhies, Bradford, Taylor, or Robert Martin in Ernest Martin's room and suggesting to them anything about holding up the State House; that he never at any time drew any plans to show how to get in the State House or any office therein, and that he never proposed to either

Martin or Singleton to hold up the State House or any office therein.

The evidence in this case is very voluminous, but we think we have narrated enough for the purpose of this opinion. It is to be noted that the indictment charges that it was the purpose of the conspiracy to rob Alice Ferguson and Marcia Murphy of money which belonged to the State of Indiana. It also must be remembered that they worked in the Automobile License Department in the basement of the State House. In none of the alleged conversations in the formation of the alleged conspiracy was the name of Alice Ferguson or Marcia Murphy mentioned or anything said that would lead one to believe that it was the purpose to rob them. And it is also significant that the plans or drawings alleged to have been made by the appellant were of the office of State Treasurer and not of the office of the Automobile License Department in the basement. Moreover, the conversations related to the robbing of the State House. And more significant than all is the fact that there was a total lack of evidence showing any preparation or meeting of any of the parties on the morning of February 15, to complete the conspiracy.

There are certain well defined principles of law as applied to the crime of conspiracy. In order to be a conspiracy there must be an intelligent and deliberate agreement to do the acts and commit the offense charged. There need not be any formal agreement between the parties to do the acts charged. In the case of *Eacock* v. *State* (1907), 169 Ind. 488, 502, 82 N. E. 1039, the court, in considering a charge of conspiracy, said:

"It is sufficient if the minds of the parties meet understandingly so as to bring about an intelligent and deliberate agreement to do the acts and commit the offense charged, although such agreement be

not manifest by any formal words. Concurrence of sentiment and cooperative conduct in an unlawful and criminal enterprise, and not formality of speech, are the essential ingredients of criminal conspiracy."

Many authorities are cited in the above case sustaining the foregoing proposition. There must be an agreement or joint assent of the minds of two or more before there can be a conspiracy. Such agreement or joint assent of the minds need not be proved by direct evidence. Neither is it necessary to prove that the parties came together and actually agreed in terms to commit a certain felony. *Kleihege* v. *State* (1934), 206 Ind. 206, 188 N. E. 786. There must be, however, an agreement and there must be such evidence to prove the agreement directly or such a state of facts that an agreement may be legally inferred. Conspiracies can not be established by a mere suspicion, nor does evidence of mere relationship between the parties or association show a conspiracy. 12 C. J. 638.

Applying the law to the evidence in the instant case we think it is clear that a conspiracy was not established as charged in the indictment. The decision of the court was not sustained by sufficient evidence. In our judgment there is a total lack of evidence to show an intelligent and deliberate agreement to do the things charged, or any facts from which such an agreement may be inferred. The most that can be said, there were propositions submitted by the appellant "to hold up the State House." But if the said proposition was made, there is no evidence to show that the minds of the parties, at least two, met understandingly so as to bring about an intelligent and deliberate agreement, or such a state of facts from which such an agreement could be inferred to do the things charged in the indictment.

One of the reasons assigned by appellant is that the decision is contrary to law. It is said in the case of *Bosseker* v. *Cramer* (1862), 18 Ind. 44, 45, that:

"We think that a verdict which is contrary to law, is one which is contrary to the principles of law as applied to the facts which the jury were called upon to try; contrary to the principles of law which should govern the cause."

So in the instant case we think the decision is contrary to the principles of law when applied to the facts in the case.

The appellant has presented some questions in the instant case as to the rejection of certain evidence, but we do not consider it necessary to pass upon the same. The judgment is reversed on the ground that the decision is contrary to law and not sustained by sufficient evidence.

Judgment reversed.