323 A.2d 561.

STATE *vs.* WILLIAM MURPHY.

AUGUST 5, 1974.

PRESENT: Roberts, C. J., Paolino, Joslin, Kelleher and Doris, JJ.

566

KELLEHER, J. In June 1972, the grand jury for the Counties of Providence and Bristol returned two indictments against the defendant. The first indictment charged Murphy with conspiring with one Robert Fontaine to bribe a person summoned to serve as a petit juror. The second indictment charged Murphy with the substantive offense of actually offering to bribe the potential juror. Fontaine was also indicted as a co-conspirator and charged with bribery. The cases were consolidated for a jury trial in the Superior Court. The jury returned guilty verdicts on all of the indictments. Motions for new trials were denied. In this appeal, Murphy challenges the trial justice's denial of his motion for a judgment of acquittal and his motion for a new trial.

The records of the jury commissioner and the clerk of the Superior Court disclose that on May 25, 1972, John J. Gilbert, Jr. was notified that he had been chosen to serve as a petit juror in the Superior Court at any time up to and including the second Monday in July 1972. Gilbert, a resident of Providence, owns and operates a bar in Woonsocket. The bar is called the Gridiron Club. On May 30, 1972, a deputy city sergeant served a summons at Gilbert's residence telling him to appear in the Superior Court on Tuesday, June 6, 1972.

At the Murphy-Fontaine trial, Gilbert testified that shortly after noon on Sunday, June 4, 1972, he was at the Gridiron Club when he received a telephone call from Murphy. According to Gilbert, Murphy, who is a Providence city councilman, wanted to come to the bar with someone who desired to meet Gilbert. Gilbert informed Murphy that he would not be available until sometime later that evening. Gilbert then left his place of business to attend a testimonial dinner given for an employee who had retired. When he returned to the club, it was close to 8 p.m. Upon entering the premises, Gilbert observed Murphy and another man seated at the bar. Gilbert went to the bar. Murphy introduced Fontaine as "Bobby." Introductions over, Murphy told Gilbert that Bobby preferred to talk to him away from the bar. The trio went to a corner table located at the extreme opposite end of the premises. Murphy returned to the bar.

At this point, Gilbert said, Fontaine told him that he would be selected as a member of the jury that would hear the first degree murder case of State v. Richard Callei. He further informed Gilbert that he could earn $2,000 if he influenced the jury, $3,000 if there were a hung jury, and that if everything went right for Callei, it was worth $5,000. After first expressing shock at such an offer, Gilbert agreed to meet Fontaine the following evening in a Pawtucket diner to discuss the matter in greater detail. The conference ended. Fontaine rejoined Murphy at the bar. They finished their drinks and drove back to Providence. After their departure, Gilbert contacted Inspector Raymond Tempest, a veteran member of the Woonsocket Police Department, and informed him of the evening's events. The inspector and Gilbert are friends.

Murphy testified and gave a completely different reason as to why he and Fontaine went to Woonsocket on Sunday, June 4, 1972. He insisted that he did not call Gilbert.

Rather, he said, it was Gilbert who called his home once on June 3 and again on June 4 when he told Murphy that he had "some information pertaining to his [Callei] forthcoming trial." Murphy also said that Gilbert wanted to know if the councilman knew "anyone close to Dick." Murphy acknowledged his friendship with Callei and agreed to go to the Woonsocket bar. The appointment was scheduled for 7:30 p.m. Murphy then left his home and while walking on Pocasset Avenue, he hailed Fontaine who was driving by. Murphy told Fontaine about his conversation with Gilbert. Fontaine agreed to go to Woonsocket.

Murphy told the jury that all three individuals participated in the corner conference. According to Murphy, Gilbert stated that he would guarantee a hung jury in the Callei trial but that the guarantee would cost $10,000. Murphy replied, "Are you crazy or something?" Fontaine and he left the premises and returned to Providence.

Having reported the contradictory versions of what occurred in the Gridiron Club on the mid-evening of June 4, 1972, we shall consider the motions for judgment of acquittal and a new trial. As we do, we shall relate these issues to other pertinent portions of the testimony.

In determining a motion for a judgment of acquittal, the trial justice does not weigh the evidence or assess credibility. He views the evidence in a light most favorable to the prosecution, and draws therefrom all reasonable inferences favorable to the prosecution. We must do likewise on review. *State* v. *Moretti*, 113 R. I. 213, 319 A.2d 342 (1974). The denial of such a motion which is made at the conclusion of the prosecution's case is reviewable only if the defense has rested at the time it makes the motion. Here, the defense did not rest but offered evi-

570

dence and thereby waived any appellate review of the initial denial of its acquittal motion.

We shall first dispose of the bribery indictment. Simply stated, the record is devoid of evidence that would serve as any basis for the bribery charge lodged against Murphy. By the testimony of Gilbert himself, Murphy was not present when Fontaine offered the bribe. He was at the bar. In this jurisdiction, the common-law distinction between a principal and an accessory is still preserved. *State v. Colvin*, 82 R. I. 212, 107 A.2d 324 (1954); *State v. Patriarca*, 71 R. I. 151, 43 A.2d 54 (1945). There is nothing in the evidence which would support any inference that Murphy had participated as a principal in the substantive offense of bribery.[1] *Compare, State v. Hart*, 106 R. I. 213, 258 A.2d 70 (1969). Accordingly, the trial justice should have granted Murphy's motion for a judgment of acquittal on the bribery indictment.

However, the conspiracy indictment presents a different picture.

Initially, we shall consider Murphy's contention that, assuming the truth of all the evidence adduced against him, the prosecution has failed to prove the commission of a crime that violates any of the laws of this state. He emphasizes that on the date of the alleged conspiracy, Gilbert was not a member of the jury that would hear the Callei case. In taking this position, he relies on *State v. Nadeau*, 81 R. I. 505, 105 A.2d 194 (1954). Nadeau was a Woonsocket councilman who allegedly sought a payoff from an applicant who was seeking an appointment to the city's police department. The relevant statute in *Nadeau* is now cited as G. L. 1956 (1969 Reenactment) §11-7-3. This statute bans the solicitation of a bribe by public

---

[1] It should be emphasized that Murphy was not charged with being an accessory before the fact.

officials. The court in *Nadeau* ruled that the statute did not apply to acts that were beyond the scope of the accused's power. Since the power of appointment was vested exclusively in the Woonsocket police commission, the court held that Nadeau's motion for a directed verdict should have been granted. Murphy argues that the rationale of *Nadeau* is equally applicable to him because on Sunday evening, June 4, at the time of the alleged bribe, Gilbert was not sitting in judgment of Callei and thus was unable to influence the jury's actions in the pending murder indictment. Such a contention might have some validity if Murphy stood charged with violating the terms of §11-7-3. He is not so charged and therein lies the difference between *Nadeau* and Murphy.

The controlling statute here is §11-7-1. It reads as follows:

> "Bribery of juror or person exercising judicial function.—Every person who shall give any sum of money or any bribe, present or reward, or any promise or security for any, to obtain or influence the opinion, judgment, verdict, sentence, report or award of any judge, justice of the peace, warden, juror, auditor, referee, arbitrator, master in chancery, or person summoned as juror, in any matter or cause pending or to be tried before him alone or before him with others, shall be imprisoned not exceeding seven (7) years or be fined not exceeding one thousand dollars ($1,000)."

The language is plain, unambiguous and all encompassing. The pertinent portions of this statute tell one and all that it is a criminal offense to offer a bribe to influence the verdict of a "juror" or a "* * * person summoned as a juror, in any matter or cause pending or to be tried before him alone or before him with others * * *." The entire thrust of §11-7-1 is a legislative admonition that once a person is summoned for duty as a juror he is to be considered as unapproachable, and that one who approaches

him with bribery in mind comes within the reach of the statute. The argument that the statute does not become operative until a bribe is made to a juror who has been chosen to try a specific case is meritless.

Murphy, in seeking to establish a paucity of evidence which would indicate his participation in the Fontaine fix, has cited numerous cases in his brief concerning the necessity of proof of knowledge and the effect of mere presence, friendship or acquaintance, and relationship with one who has been charged as a codefendant or a coconspirator. We have no reason to disagree with the ruling in those cases. However, the evidence in this case justifies a finding of something more than a mere friendship or association. We had occasion only last year to discuss the conspiracy question in *State* v. *Gilman*, 110 R. I. 207, 291 A.2d 425 (1972). We said in that case:

> "In considering the conspiracy indictment it must be kept in mind that the gist of a conspiracy is the unlawful combination of two or more persons to do an unlawful act or a lawful act for an unlawful purpose with the offense being complete once the agreement is made. [cites omitted] Anyone, knowing of the conspiracy, who intentionally takes part in or does any act to further the illegal agreement becomes a participant in the conspiracy. [cite omitted]
>
> "Furthermore, there need not be any evidence that participants came together and expressly agreed to pursue a common design. [cites omitted] It is enough if they knowingly engage in a mutual plan to do a forbidden act. Conspiracy can rarely be proven by direct evidence." *Id.* at 218, 291 A.2d at 432.

There is no direct evidence connecting defendant with the conspiracy. No witness testified that he or she saw or heard defendant conspiring or agreeing with Fontaine to bribe Gilbert. Such testimony, as we noted in *Gilman*, is a rarity.

Thus, the question before us is whether the facts pre-

sented, when viewed in the light most favorable to the state, give rise to reasonable inferences sufficient to warrant submission of the conspiracy issue to the jury. *State v. Main,* 94 R. I. 338, 344-45, 180 A.2d 814, 817-18 (1962).

We are aware that a conviction in a criminal case is justified only if all the facts and circumstances necessary to establish guilt have been proven beyond a reasonable doubt. And, in the absence of direct evidence, a finding of guilt will be made only if these facts and circumstances not only are consistent with the hypothesis that a defendant was guilty but also are inconsistent with any reasonable hypothesis that he was innocent. *State v. Fortes,* 110 R. I. 406, 293 A.2d 506 (1972); *State v. Franklin,* 103 R. I. 715, 241 A.2d 219 (1968); *State v. Montella,* 88 R. I. 469, 149 A.2d 919 (1959); *State v. Blood,* 68 R. I. 160, 26 A.2d 745 (1942); *State v. Di Noi,* 59 R. I. 348, 195 A. 497 (1937).

We have within recent months emphasized that there is no legal distinction between direct and circumstantial evidence so far as its probative force is concerned. No greater degree of certainty is required when the evidence is circumstantial than when it is direct. The test for determining the sufficiency of the evidence to support proof beyond a reasonable doubt is a simple requirement, to wit, that the evidence be consistent only with a reasonable theory of guilt—if the evidence is consistent with any other reasonable conclusion, the requisite degree of guilt has not been established. *State v. Rose,* 112 R. I. 402, 311 A.2d 281 (1973). This court has also emphasized that the prosecution need not prove guilt beyond all doubt. *State v. Walsh,* 113 R. I. 118, 318 A.2d 463 (1974). A reasonable doubt has been defined as an actual substantial doubt of a defendant's guilt arising from the evidence or want thereof as distinguished from a mere suspicion or appre-

hension or imaginery doubt. *State* v. *Mantia,* 101 R. I. 367, 223 A.2d 843 (1966).

In reviewing the evidence we must look at it in the light most favorable to the prosecution. Thus we find Murphy calling Gilbert for an appointment. To keep this appointment two friends of Callei travel from Providence to Woonsocket and back to Providence, a distance of at least 32 miles. At the trial Murphy acknowledged his friendship with Callei and testified that Fontaine was friendly with Callei because Callei was the best man when Fontaine was married. Murphy was one of the wedding guests. He could also be considered as Fontaine's contact man in that he made the necessary introductions at the bar and told Gilbert that Fontaine wanted to talk to him in the corner. In the corner, after Murphy's return to the bar, Fontaine told Gilbert that he would be on the Callei jury and propositioned him. Gilbert agreed to pursue the matter further the following evening at a meeting with Fontaine at a diner located in Pawtucket. It was Murphy who called Gilbert on the following evening to tell him that Fontaine had left town and would be unable to keep the appointment.

Gilbert reported for jury duty on June 6 and was one of over 100 jurors qualified for service. Three subpanels were then chosen for service in various pending trials. Gilbert was chosen for Subpanel A. It consisted of 40 individuals and was dispatched for service in the courtroom where the Callei case was to be tried. Gilbert was in fact tentatively chosen as a member of the panel.

It was at this point that he called Murphy twice on the phone. One call was placed on June 8 and the second oc-

curred on June 9.[2] Both calls were, with Gilbert's consent, electronically intercepted and recorded by the Rhode Island State Police. Tapes of both calls are exhibits and were played to the jury.

The calls originated from Gilbert's bar. In the first call the jury heard against the background of the usual barroom clatter the following exchanges:

> Gilbert: "And, ah, I'm going to be taken [sic] off tomorrow. And, you know, I haven't seen ah, our friend there.
>
> Murphy: "Oh, you mean—Oh, I know who you're talking about now. Well, ah is he supposed to see you or what?
>
> Gilbert: "Well, you called me Monday, [June 5] and you know—.
>
> Murphy: "Well, that was the message I got, I haven't seen him myself."

Gilbert went on to tell Murphy that he had a business to run and he wanted "to beg out of this, ah, (expletive deleted) deal." When Gilbert repeated his desire to beg off, Murphy said, "I see what you mean" and then said, "All right because I - I think I know what you're getting at. But, if that's the case, I'll, I'll I don't know if I can get in touch with him, but I know somebody that may be able to." During this conversation, Gilbert told Murphy that he was leaving the bar but would return sometime near 9:30 or 10 p.m. Murphy is heard saying, "All righty, then and you want him to get in touch with you about 9:30 or ten o'clock?" Gilbert gave an affirmative reply. Gilbert then said, "But, you know what I

---

[2] At the time of the calls, Gilbert was still a member of the Callei jury. The record indicates that Gilbert became a member of the jury on June 6. The Attorney General informed the Presiding Justice of Gilbert's involvement with Murphy and Fontaine. It was agreed that he would remain on the jury while the investigation was in progress. On June 12, the Attorney General moved that the case be passed. The motion was granted. When Callei was eventually tried, the jury returned a not guilty verdict.

mean, ah, what the hell I got a business. This thing can go all summer long, and ah you know, I got a business to run and I don't, ah, I'm getting a little ah nervous about it." Murphy's final response was, "I think I know what you mean. All right, Jacky." Gilbert said, "Okay." Murphy retorted, "All right, buddy" and the callers exchanged "bye-byes."

The following evening, Gilbert called Murphy and told him, "I didn't, ah, hear anything." Murphy said he had not "seen nobody or nothing," and he really didn't know "what's going on." Gilbert spoke of the pressure on him, that he was getting out of town, and that if anyone "is lookin for me, I won't be back until late Sunday night, Billy." Murphy answered, "All right, Jack, but like I say, I don't know—you know. I mean you know what I'm trying to say too." One of Murphy's last remarks was to tell Gilbert that "* * * I want to stop and talk to you about something entirely different altogether when I stop by, Jack."

It is clear that after the bribe had been offered, Gilbert went to the police.

An illegal confederacy may be inferentially established by proof of the relationship, conduct, circumstances and acts of the parties. *State* v. *Gilman, supra.* Taking the totality of the evidence to which we have just alluded, we note first the furtive manner Murphy exhibited on the evening of June 4. His use of the name "Bobby" when introducing Fontaine and his insistence that they go to the corner manifest a desire for privacy which in turn indicates a knowledge of what was on Fontaine's mind. Murphy's continuing role as an intermediary in relaying or attempting to relay messages of Fontaine to Gilbert and vice versa, his reply of "Oh, I know who you're talking about now" to Gilbert's complaint that Gilbert had not seen "our friend," plus his express desire to stop by and

talk to Gilbert about "something entirely different," give rise to a reasonable inference that Murphy was a knowing and willing participant in a plan to sway the Callei jury. Since there was evidence from which the jury could find a conspiracy between Murphy and Fontaine, the trial justice did not err in denying Murphy's motion for a judgment of acquittal.

As we consider the denial of Murphy's motion for a new trial, it should be stressed that no objections were taken to the charge nor does he press any objections to the evidence[3] presented by the prosecution. It is elemental that a trial justice when considering a motion for a new trial is bound to follow the law he has given to the jury in his charge. *State* v. *Walsh,* 108 R. I. 518, 277 A.2d 298 (1971). No objection having been taken to the charge, the instructions as given were the law of the case. *State* v. *Card,* 105 R. I. 753, 255 A.2d 727 (1969). Rule 30 of the Superior Court's Rules of Criminal Procedure specifically bars a party from assigning as error any portion of the charge or omission therefrom unless he specifically directs the trial justice's attention to the matter to which he objects and gives the ground for his objection.

The trial justice did not, nor was he asked to, give the so-called *Montella*[4] rule, and accordingly he did not inform

---

[3] Before trial, an oral motion was made to suppress the use of the tapes as evidence. In 1969, the General Assembly enacted P. L. 1969, ch. 55, which authorizes the interception and use of certain oral and telephonic conversations. The trial justice in denying the motion cited G. L. 1956 (1969 Reenactment) §11-35-21 (c)(2), which states that it shall not be unlawful to tap a telephone call when one of the parties to the call has given his prior consent to the tap.

[4] The circumstantial evidence rule took on prominence in this jurisdiction with the holding in *State* v. *Montella,* 88 R. I. 469, 149 A.2d 919 (1959), where four officials stationed at a Providence polling place were indicted for and convicted of conspiring to violate the election laws. There was evidence that showed that someone had dumped hundreds of ballots into

the jury that before it could return a guilty verdict it had to be satisfied that the evidence excluded every reasonable hypothesis but that of Murphy's guilt as a conspirator.[5] Rather, he defined circumstantial evidence as circumstances which give rise to an inference. He informed the jury that it is their right to draw inferences from facts it has accepted as proven. The trial justice spoke of reasonable doubt in the light of the holding in *State* v. *Mantia, supra.*

One seeking to set aside the denial of his motion for a new trial has the burden of showing that the trial justice was clearly wrong or that in reviewing the evidence and its weight and the witnesses's credibility he misconceived or overlooked some material evidence on a controlling issue. *State* v. *Rose, supra.*

Murphy has argued that the trial justice in denying his new trial motion had completely rejected his testimony and that in doing so the only evidence relating to the conspiracy charge came from the lips of Gilbert. Such evidence, he claims, was not sufficient to establish his guilt beyond a reasonable doubt. Murphy has totally misconceived the thrust of the trial justice's comments. The pertinent portions of his remarks are:

---

the ballot box. An acquittal was ordered because, while the evidence indicated that two or more of the defendants had conspired, the evidence did not point to any specific defendant, and since all were entitled to the presumption of innocence, all were entitled to an acquittal.

[5] It might be that trial counsel's action is an indication of its agreement with the remarks made by the Supreme Court when in *Holland* v. *United States,* 348 U. S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954), the Court said that when a jury is properly instructed on the standards of reasonable doubt, any additional instructions as to the quantum of proof needed where the record contains circumstantial evidence is "confusing and incorrect."

"* * * I fully agree with what the jury did here. We had here, head-on conflicts between the principal witnesses, Mr. Gilbert and Mr. Wheeler for the State, and Mr. Murphy and Mr. Brady[6] for the defendants. Gilbert impressed me as telling the truth. I think he was a truthful witness and I'm satisfied that Murphy and Brady lied under oath. The cross-examination of Murphy fully demonstrated that *his testimony on direct,* which itself was hard to take at face value, was not worthy of belief and the same can be said of Brady, in content and manner. * * * And I'm satisfied that he, Mr. Fontaine, who, according to Murphy, had been the best man for Callei at Callei's wedding, was, of course, the one who made the approach to Gilbert with the help of his friend Murphy. As far as Mr. Murphy's testimony is concerned, the testimony he gave is completely inconsistent with the responses made over the telephone on June 8th and June 9th—completely inconsistent." (emphasis added)

---

[6]Wayne R. Brady testified as a witness for the defense. He manages his wife's cocktail lounge located in Providence. In his testimony Brady said that in early May 1972 he had stopped at the Gridiron Club. There, he saw Gilbert, who allegedly told Brady of his financial difficulties. Brady then informed Gilbert that he had been indicted for loan sharking, at which point Gilbert allegedly said, "It would be nice to have a friend among those twelve people that are sitting there judging you." Brady said he laughed, but Gilbert then added, "Well, don't laugh for the sake of a few thousand dollars. You'd lose a lot more if you end up going to jail." Brady stated that he was not interested.

In cross-examination, Brady conceded that within a week or two after the return of the indictments he learned that Murphy had been charged in connection with the bribery of Gilbert; that he knew Murphy but that during the period from June to September 1972 he had never told Murphy about the incident. Just before the conclusion of the testimony, there was a face-to-face confrontation between Gilbert and Brady. Gilbert took the stand and denied that he had ever seen Brady in his life. Brady then left the courtroom. Later, Brady returned to the courtroom; his second appearance was without his hairpiece. At this point Gilbert was then asked if he knew the somewhat balding individual that stood before him as a man called "Curly." The trial justice sustained the prosecution's objection and both sides rested.

As one looks at the record in this case, he observes a tapestry, part of which was woven by Murphy. Credibility played a most important part in the determination of what actually transpired in the corner at the Gridiron Club. By taking the stand, Murphy put his credibility right on the line. He painted Gilbert as the "briber" and himself as the "bribee." He insisted that he was present during the entire time Fontaine and Gilbert were together in the corner. He denied that once the trio reached the corner table he left and went to the bar. It is clear that what the trial justice rejected was Murphy's version as to who offered the bribe.

One of the state's witnesses was a state police detective, Richard M. Wheeler. Detective Wheeler testified that he was driving past the Gridiron Club on June 4 when he noticed Fontaine's car in the club's parking lot. Wheeler, who was off-duty at this particular time, parked his car and entered the club. There, he observed Fontaine and Murphy at the bar. He knew Fontaine but did not know Fontaine's companion. The officer told the jury about Gilbert's 8 p.m. entrance, the exchange of greetings at the bar, the trip to the corner table, and *Murphy's return to the bar* while Gilbert and Fontaine talked in the corner. When the duo left the bar, Wheeler asked Gilbert what went on in the corner and Gilbert told him that Fontaine asked him about his forthcoming jury duty.

Wheeler called the Lincoln barracks and reported what he had witnessed. Trooper Thomas Hefner testified that at approximately 8:55 p.m. on June 4, he stopped the Fontaine vehicle on Route 146 as it was traveling south. Trooper Hefner said the stop occurred in Providence near the Branch Avenue on-ramp. Fontaine's passenger identified himself as William J. Murphy, a Providence councilman.

The tapes of Murphy's telephone conversations with Gilbert are completely at odds with the picture he at-

tempted to portray in the courtroom. At the trial Murphy described Gilbert as some kind of a nut. He insisted that it was Gilbert who called him on Monday evening, June 5. He declared that when Gilbert called him again on June 7, he disguised his voice and said, "Bill is not here," and Gilbert hung up. The recorded intonations of phrases such as "All righty, Jack" and "All right, buddy" convey a tone of more fellowship and congeniality than professed by Murphy during his appearance on the witness stand. In the tape of the June 8 call, Murphy acknowledges that he called Gilbert and delivered a message. This particular conversation buttressed Gilbert's testimony that on the Monday evening following the trio's initial get-together Murphy had called him about Fontaine's inability to meet him at the Pawtucket diner. This acknowledgment is a further divergence from Murphy's testimony that he and Fontaine left the Gridiron Club because Gilbert was either mentally deranged or trying to frame Fontaine. Murphy's parting remarks on June 9 of wanting "to stop and talk to you about something entirely different altogether" support the reasonable inference that Murphy was well aware of the nature of the offer made by Fontaine. The trial justice remarked about the inconsistencies between Murphy's testimony and his telephone responses to Gilbert's complaints about "pressure" and his desire to "beg off" and about seeing "our friend."

In his cross-examination of Murphy the prosecutor further demonstrated the weakness of his direct testimony. Two tales of bribery were told. Gilbert, after receiving the offer, went to the police. Murphy, an elected public official, conceded that he did not tell either Trooper Hefner or Providence's Commissioner of Public Safety or the city's police chief of his encounter with Gilbert because he was "befuddled" or "upset." He explained that because of Gil-

bert's influence, it would be useless to go to anyone in authority.

Again, in direct examination, Murphy testified that during a seven-month period in 1969 he managed a cocktail lounge in Woonsocket. During this time he had seen Gilbert "several times." During cross-examination, he conceded that from late 1969 until June 4, 1972 he had seen Gilbert no more than three times and each of these encounters consisted of greetings such as a simple, "Hello * * * because I just don't have that much to say to Mr. Gilbert." Murphy agreed with the cross-examiner's assertion that prior to June 1972, Gilbert had never called him except to inquire about the whereabouts of a Frank DiIorio or to talk about a bar bill Gilbert allegedly owed to the lounge Murphy managed. The trial justice remarked that it was highly unlikely that Gilbert would approach a casual acqaintance such as Murphy in the manner Murphy described.

We see no need to pinpoint other facets of the record that warranted the jury's verdict and the denial of the new trial motion.

The defendant's appeal is affirmed in part and denied in part and the cause is remanded to the Superior Court for further proceedings.

MR. JUSTICE DORIS, dissenting. I concur with the majority that the trial justice erred when he denied the defendant Murphy's motion for judgment of acquittal on the indictment charging bribery. I also concur with the majority that when the trial justice considered Murphy's motion for judgment of acquittal on the conspiracy indictment there was evidence in the record from which the jury could find a conspiracy between Murphy and Fontaine and that consequently the trial justice did not err in denying Murphy's motion. In considering the defendant's appeal from the denial of his motion for a new trial

on the conspiracy indictment however, I have concluded that the trial justice committed error when he denied the defendant's motion.

It is significant that the trial justice in denying defendant's motion for a new trial stated that Gilbert impressed him as telling the truth, but that Murphy had lied under oath and his testimony was not worthy of belief. It is true that the trial justice in considering the testimony of a witness may accept or reject the entire testimony or may accept part and reject part thereof. If he accepts a part and rejects a part of the testimony, it is incumbent upon him to point out in the record what part he accepts and what part he rejects. Here the majority indicates that only a portion of Murphy's testimony was rejected by the trial justice. However, on my reading of the record, especially in the absence of any statement by the trial justice as to what portions are accepted and/or rejected, I conclude that the entire testimony of Murphy was rejected by the trial justice when he stated that Murphy's testimony was not worthy of belief. I might also point out that the state in its brief concedes that the entire testimony of Murphy was rejected by the trial justice.

There is no claim by Murphy that the trial justice failed to exercise his independent judgment or misconceived or overlooked material evidence. Murphy does not question the ruling of the trial justice as to credibility. He does not question the conclusion of the trial justice that Fontaine made an approach to Gilbert with an offer of money. The defendant disputes, however, the conclusion of the trial justice that the record indicates that he knowingly helped Fontaine in making such an offer to Gilbert. Murphy argues strenuously that the evidence and the inferences reasonably to be drawn therefrom are insufficient to sustain a finding that he had knowledge of the offense charged in the indictment. The defendant urges that we follow

the approach adopted by this court in *State* v. *Montella,* 88 R. I. 469, 477, 149 A.2d 919, 923 (1959), wherein we said:

> "Our conclusions are based not on the credibility of witnesses but rather on the insufficiency of the evidence to exclude every other reasonable hypothesis but defendants' guilt. For these reasons we are of the opinion that the trial justice was clearly wrong in denying the motions for a new trial."

In determining the issue as raised by defendant, we are required to accept as truthful all competent evidence, which, if believed, would support the verdict, and then decide whether that evidence is sufficient to prove a defendant guilty beyond a reasonable doubt. *State* v. *Contreras,* 105 R. I. 523, 253 A.2d 612 (1969). In this case there is no direct evidence that Murphy conspired as charged in the indictment. Proof of guilt can be found, if at all, only by inferences which can reasonably be drawn from the established facts.

Before there can be a conspiracy, there must be an agreement or joint assent of the minds of two or more persons, and such agreement or joint assent need not be proved by direct evidence, but there must be evidence to prove the agreement or joint assent directly or such a state of facts that an agreement or joint assent may be legally inferred. Conspiracies cannot be established by a mere suspicion, nor does evidence of a relationship or association between the parties show a conspiracy. *Johnson* v. *State,* 208 Ind. 89, 194 N. E. 619 (1935).

The standard of proof necessary to sustain a criminal charge is guilt beyond a reasonable doubt. In a case where there is no direct evidence, as here, a finding of guilt will be warranted only if all the facts and circumstances necessary to establish that guilt, taken together, not only are consistent with the hypothesis that defendant was guilty, but also are inconsistent with any reasonable hypothesis

that he was innocent. *State* v. *Franklin,* 103 R. I. 715, 241 A.2d 219 (1968) ; *State* v. *Montella, supra.* Where the evidence is consistent with any reasonable hypothesis of innocence, it necessarily gives rise to a reasonable doubt of the guilt of the accused. *State* v. *Rose,* 112 R. I. 402, 311 A.2d 281 (1973).

Since I consider the trial justice's statement that Murphy's testimony was *not worthy of belief* to be a rejection of the defendant's entire testimony, the action of the jury and the trial justice must be viewed as based entirely on the evidence presented by the state. I do not dispute that it may be reasonable to infer from the state's evidence that Murphy had knowledge of and was a party to a conspiracy to bribe Gilbert, yet I cannot agree that the same facts do not support a reasonable hypothesis of innocence of such a conspiracy. I consequently conclude that the evidence fails to exclude any reasonable hypothesis of innocence and that the evidence adduced has not proved the defendant guilty of conspiracy beyond a reasonable doubt. I therefore conclude that the trial justice was clearly wrong in denying the defendant's motion for a new trial.

Accordingly I would sustain the appeal of the defendant as to the denial of his motion for a new trial. I therefore dissent from the opinion of the majority insofar as it relates to the defendant Murphy's appeal from the trial justice's denial of his motion for a new trial on the conspiracy indictment.

Motion for reargument denied.

*Richard J. Israel,* Attorney General, *Donald P. Ryan,* Asst. Attorney General, for plaintiff.

*McKinnon & Fortunato, Stephen J. Fortunato, Jr.,* for defendant.