STATE

v.

Giulio BERTOLDI.

84–316–C.A.

Supreme Court of Rhode Island.

July 5, 1985.

Arlene Violet, Atty. Gen., Charles M. Nystedt, Sp. Asst. Atty. Gen., for plaintiff.

John A. O'Neill, Jr., Providence, for defendant.

## OPINION

MURRAY, Justice.

This is an appeal by the defendant, Giulio Bertoldi, from a jury conviction of first-degree arson. He was sentenced by the trial justice to forty years' imprisonment, thirty years to serve and ten years suspended. Before we consider the defendant's assignments of error, we briefly set forth the factual background of this case.

The state's evidence below showed that defendant had enlisted Kevin Cimino (Cimino), who was then fifteen years old, to set fire to a residential apartment house owned by defendant in order that he could collect the insurance proceeds. The house was occupied at the time, although Cimino apparently was led to believe that it was vacant. The defendant did not seriously contest the fact that a fire had occurred, that it was incendiary in nature, and that in fact Cimino had set the fire. Rather, the defense was predicated on the argument that defendant did not procure Cimino's services in order to accomplish the act. Toward this end, defendant took the stand and denied any involvement with the fire. This statement directly contradicted the earlier testimony of Cimino, who had testified under a grant of transactional immunity that defendant had promised to pay him $2,000 if the building was "totaled" by the fire or $500 if the fire caused less extensive damage. Cimino further testified that defendant had given him specific instructions on how to accomplish the arson most effectively, had placed old newspapers in the attic to ensure that the fire would spread quickly, and had generally attended to all the preliminary matters necessary to carry out this crime, including furnishing Cimino with a mask so that he would not be recognized. Cimino testified, still under transactional immunity, that he set fire to the attic of the house on Halloween night, October 31, 1981. Robin Savitsky, Cimino's sister, corroborated her brother's testimony by testifying that her brother had confessed to her shortly after the fire and that she had urged him to turn himself in to the authorities. She also testified to the substance of a phone conversation that occurred two or three weeks after the fire between her brother and defendant. The conversation involved payment of moneys to Cimino for his part in the crime.

The defendant's first assignment of error concerns a cautionary instruction to the jury given by the trial justice. Following the state's direct examination of Cimino, defense counsel attempted to impeach him by questions regarding Cimino's prior convictions. When impeachment was concluded, the trial judge explained to the jury the statutory means of impeachment by prior convictions. He then instructed the jury with regard to immunity:

"The Presiding Justice then, in his discretion, can either decide to grant or not grant that witness immunity. If the Presiding Justice grants the Petition, filed by the Attorney General, the witness can then be called. He cannot thereafter claim his Fifth Amendment privilege because he has been granted immunity by the state, acting through the Presiding Justice of this court, *which means if for anything that he says here, he cannot be prosecuted except, except for any untruthful testimony he may give in this court, which is perjury. For that he can be prosecuted regardless of immunity.* So what I'm saying to you is this. In this case the Presiding Justice has seen fit to grant this witness immunity based upon the testimony regarding the incident in question. And in return for his testimony, he cannot be prosecuted by the state of Rhode Island in any way, shape or fashion for anything he has said here regarding the fire at Linwood Avenue that he has testified to. *The only thing that he can be prosecuted for, if he is ever prosecuted, it would be for any untruthful answers he gave here during the course of this trial. That's all.* So he's been immunized, so to speak, by the Presiding Justice. I think counsel said a justice of this court granted you immunity. I wanted that cleared up, because I didn't want you to think the trial judge heard something you haven't heard. I'm listening to his testimony just like you are listening to his testimony. So much for the admonitions I'm required to pass on to the jury according to the cases." (Emphasis added.)

The defendant now claims that this cautionary instruction unfairly prejudiced him in that the trial judge essentially "vouched" for Cimino's credibility by stat-

ing that the only charge he could be held accountable for was perjury. Appellate counsel asserts that credibility was the major factor upon which this trial turned. The defendant's testimony was pitted against the testimony of Cimino and his sister, and through this instruction, defendant asserts, the trial justice improperly tipped the scales against defendant.

■ We decline to reach the merits of defendant's argument. An examination of the record reveals that defense counsel failed to object to the above-quoted instruction, a condition precedent to appellate review under Rule 30 of the Superior Court Rules of Criminal Procedure. Absent extraordinary circumstances, that failure precludes review of the instruction in this court:

> "Under our established procedure, defendant's failure to object to the instruction given or to request a different one precludes, at least in ordinary circumstances, a challenge to the correctness or sufficiency of the charge given. *State v. Bowden*, 113 R.I. 649, 665, 324 A.2d 631, 641 (1974), *cert. denied*, 419 U.S. 1109, 95 S.Ct. 782, 42 L.Ed.2d 805 (1975); *see* Super.R.Crim.P. 30. Where neither the objection nor the request has been made, the charge as given, even if erroneous, becomes the law of the case. *State v. Murphy*, 113 R.I. 565, 577, 323 A.2d 561, 567 (1974)." *State v. McGehearty*, 121 R.I. 55, 60, 394 A.2d 1348, 1351 (1978).

■ From *McGehearty* can be gleaned a two-part inquiry to be undertaken when a criminal defendant raises the propriety of a jury instruction (or lack thereof) for the first time on appeal. First, does the challenged instruction raise an issue of constitutional import? Only if this question is answered in the affirmative will this court undertake the second inquiry: Did the failure to object to the instruction, and thus the failure to comply with a procedural requirement for review, constitute a "deliberate bypass" or "sandbagging" by defense counsel? The *McGehearty* court found that the challenged instruction had the effect of shifting the burden of proof from the state to the defendant in a manner which implicated the constitutional principles enunciated by the Supreme Court in *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), and *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). It thus went on to consider the question of "sandbagging," and, finding none, reached the merits of the defendant's argument.[1]

■ In the present case, we need not inquire as to whether defense counsel's failure to object was the result of trial strategy, for we find that defendant has not raised an issue of constitutional significance. Even assuming, *arguendo*, that the trial justice's instruction on immunity was in error, such error did not deprive defendant of a "basic constitutional right." *State v. Vargas*, — R.I. —, —, 420 A.2d 809, 815–16 n. 6 (1980). The challenged instruction was simply a correct statement of the law regarding transactional immunity. While we would not have taken exception to a clarifying instruction to the effect that *all* witnesses, not just Cimino, are subject

---

1. Although of limited significance given our present holding, it should be noted that in *State v. Pope*, — R.I. —, —, 414 A.2d 781, 786–87 (1980), we greatly limited the thrust of *State v. McGehearty*, 121 R.I. 55, 394 A.2d 1348 (1978). In *Pope* we observed that by permitting the defendant in *McGehearty* to raise the constitutional issue for the first time, we did not wish to leave the bar with the impression that we had jettisoned our well-established rules which require the raising of a constitutional issue in the first instance at the trial level. We emphasized the fact that at the time of the trial in *McGehearty*, there was a cloud of uncertainty concerning

the full impact of *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), on Rhode Island's long-standing requirement that intoxication was an affirmative defense. Shortly therafter, we pointed out in *State v. Duggan*, — R.I. —, —, 414 A.2d 788, 791 (1980), that when a petitioner does not raise well-established claims that should have been anticipated by counsel at his trial, the *McGehearty* rule may not be applicable. Consequently, it may not be sufficient to show that defendant has not deliberately "sandbagged" the trial justice when he fails to raise an issue that is already well-established law.

to prosecution for perjury in the event that untruthful testimony is given, or an admonishment by the trial justice to the jury that he in no way meant to imply that Cimino was more credible than any other witness, the instruction given was, on the whole, a fair and accurate description of the law regarding transactional immunity. Certainly nothing said by the trial justice could rise to the level of a denial of defendant's due-process rights. Thus, we decline to reach the merits of defendant's argument.

■ The defendant also takes exception to the fact that the trial justice failed to give the jury a so-called "accomplice instruction." Such an instruction would admonish the jury that the testimony of an accomplice "should be examined by you [the jury] with greater care than the testimony of an ordinary witness" because that testimony "may be colored in such a way as to further the witness's own interest * * *." *Federal Jury Practice and Instructions* § 17.04 at 529 (3d ed. 1977). Overlooking *State v. DeMasi*, —— R.I. ——, 413 A.2d 99 (1980), a case that specifically rejected the need for any such instruction, it appears that defense counsel again neither requested an "accomplice instruction" nor objected to the lack of one. For the same reasons as are stated above, we hold that Rule 30 precludes our review of this issue. As a final word on this matter, we concur with the opinion of Mr. Justice Rehnquist, who views

> "the trial of a criminal case in state court as a decisive and portentous event. A defendant has been accused of a serious crime, and this is the time and place set for him to be tried by a jury of his peers and found either guilty or not guilty by that jury. To the greatest extent possible all issues which bear on this charge should be determined in this proceeding: the accused is in the courtroom, the jury is in the box, the judge is on the bench, and the witnesses, having been subpoenaed and duly sworn, await their turn to

testify. Society's resources have been concentrated at that time and place in order to decide, within the limits of human fallibility, the question of guilt or innocence of one of its citizens. Any procedural rule which encourages the result that those proceedings be as free of error as possible is thoroughly desirable, and the contemporaneous-objection rule surely falls within this classification." *Wainwright v. Sykes*, 433 U.S. 72, 90, 97 S.Ct. 2497, 2508, 53 L.Ed.2d 594, 610 (1977).

The defendant also challenges the testimony of Robin Savitsky, Cimino's sister, concerning a telephone conversation between her brother and defendant. The evidence presented below showed that two or three weeks after the fire, Cimino called defendant to ask for his money. While he was dialing, he motioned to his sister to pick up an extension phone, located in the bedroom of Ms. Savitsky's apartment.[2] Cimino was speaking on a phone in the kitchen. When Ms. Savitsky picked up the extension phone the number had been dialed and the phone on the other end was ringing. When the phone was answered, Cimino said, "Hello Giulio." A voice replied, "Yes, what can I do for you?" A discussion ensued regarding the fire and defendant's failure to pay Cimino the promised money. The conversation ended with defendant telling Cimino to "go to hell, that he wasn't getting one red cent" and that if Cimino "turned around and told the cops, whatever, there would be danger."

■ We have reviewed the transcript carefully and find defendant's argument that a proper foundation was lacking to be without merit. Ms. Savitsky testified that she was acquainted with defendant because he was her mother's landlord. Although she had never had a conversation with him, she had heard him speak on more than one occasion. She was able to recognize his

---

2. Although Kevin Cimino could not remember from where he had placed the phone call, his sister testified that it was made from her apartment.

voice.[3] We think the circumstances surrounding this phone call, including Ms. Savitsky's prior contacts with defendant, defendant's affirmative response to "Hello

3. There is one inconsistency in Ms. Savitsky's testimony concerning her ability to independently recognize defendant's voice. In his brief to this court, appellate counsel stresses the following question and answer: "Q. And you didn't know Mr. Bertoldi's voice on the telephone, did you? A. No." A review of the transcript, however, reveals that this answer was apparently the result of confusion on the part of a relatively unsophisticated witness in the face of a pressing cross-examination. Both before and after this negative answer, the witness stated she did recognize the defendant's voice.

Direct Examination

"Q. Keep your voice up. This is important. Now, did there come a time when you had, or overheard a telephone conversation involving your brother?

"A. Yes, I did.

"Q. Where did this telephone conversation take place?

"A. In my house.

"Q. Is this at 532 Plainfield Street?

"A. Yes.

"Q. When did this take place, to the best of your recollection?

"A. About two or three weeks after the actual fire.

"Q. All right. Do you know who he was talking with?

MR. BERSON: Objection, Your Honor.

THE COURT: Yes or no.

"A. Yes.

"Q. How do you know who he was talking with on the telephone?

"A. Because I was on the other end of the phone when Giulio had picked it up.

"Q. You were on an extension?

"A. Yes.

MR. BERSON: Objection, Your Honor, move to strike that answer.

THE COURT: Denied. The answer may stand.

"Q. This was another extension in your house?

"A. Yes.

"Q. Why were you on the phone?

"A. Because my brother asked me to get on the phone.

"Q. Now did you recognize any voices other than your brother's?

"A. Well, I didn't recognize his voice at first, but when he said, Hello, Giulio," Giulio replied, "Yes. What can I do for you?"

MR. BERSON: Your Honor, I would object to the answer and move to strike.

THE COURT: Denied.

"Q. Did you recognize the voice at that time?

"A. Um—sort of, yes, because I haven't really noticed him, you know. I haven't met him all that much so on the basis of what I did meet of him. It did sound a little like his voice."

Cross Examination

"Q. Did you observe your brother dial a telephone number in regards to the conversation you overheard?

"A. No, I didn't.

"Q. Where were you when your brother was dialing the number?

"A. Walking to pick up the other phone.

"Q. And your brother had directed you to do that?

"A. Yes.

"Q. When you picked up the other telephone, was the conversation already in progress?

"A. No, the phone was ringing.

"Q. The phone was ringing. When did you first meet or become introduced to the Defendant?

"A. When I was visiting my mom he had come to collect the money for the rent.

"Q. Were you formally introduced to the Defendant?

MR. NYSTEDT: Objection to this line of questioning, Your Honor.

"A. Yes, my mom did.

"Q. And did you have a conversation with the Defendant at that time?

"A. No, because they were talking business about the rent and stuff, so I just stayed out of it.

"Q. That was not—their discussion about the rent was of no concern of yours at that time, is that right?

"A. Right.

"Q. You had no reason to stop and talk to Mr. Bertoldi, is that correct?

"A. Correct.

"Q. And did you ever speak to Mr. Bertoldi on the telephone?

"A. No.

"Q. So when your brother told you to pick up the extension, he told you that he was going to be calling Giulio Bertoldi, is that correct?

"A. Yes.

"Q. And you didn't know Mr. Bertoldi's voice on the telephone, did you?

"A. No.

"Q. And if your brother had not told you he was calling Mr. Bertoldi—excuse me. If your brother, at the time of the conversation that you overheard on the telephone, if your brother had not told you he was calling Mr. Bertoldi, you would not have known it was Mr. Bertoldi on the telephone, would you?

MR. NYSTEDT: Objection.

"A. Yes.

THE COURT: Overruled. The answer may stand. What does that mean?

"A. Yes, I would have known because when—

THE COURT: All right, you would have known his voice. Pick it up from there.

MR. BERSON. Yes, Your Honor."

We think it is significant that the trial justice, after observing the entire testimony of Ms. Sav-

Giulio," and Cimino's corroboration of his sister's version of the incident, lead to the unmistakable conclusion that it was defendant on the other end of the phone call. Thus, we reject defendant's argument as to this issue.

■ Finally, defendant asserts that the trial justice improperly considered certain factors in determining his sentence. Specifically, the trial justice took into consideration the fact that defendant, in the court's opinion, "gave patently false testimony" when he took the stand in his own defense. Before we address this issue, the trial justice's remark concerning defendant's apparent perjury should be put in context. The record reveals that the trial justice considered a myriad of factors in determining the sentence, and that defendant's untruthful testimony was by no means a predominant factor in the court's sentence. The trial justice took into account defendant's prior contacts with our judicial system, defendant's age and family ties, his motivation for committing this crime, his emotional makeup, his attitude toward society, his background, education, and employment, the question of whether restitution had been made or was contemplated, the effect the sentence would have as a deterrent to other members of society who would be inclined toward this type of activity, and the fact that the apartment building was occupied when the fire was set. In effect, the trial justice examined in detail just those factors that this court has held to be probative to sentencing: the severity of the crime, the possibilities for rehabilitation, deterrence to others, and the appropriateness of the punishment for the crime. *State v. Upham,* —— R.I. ——, 439 A.2d 912 (1982). It is in this context that we consider the trial justice's comment on defendant's testimony.

■ There can be little doubt that a criminal defendant's prospects for rehabilitation should be a major consideration in the mind of a trial justice when imposing sentence. Of course there are many factors that go into this consideration, not all of which can be categorized or succinctly described. These factors concern the defendant's attitude toward society, the remorse or guilt that a defendant may feel for having committed a crime, and his or her willingness and ability to take a place as an honest and useful member of society. These generalities may be broken down into an almost infinite number of specifics, many of which can be observed by a trial justice during the course of a trial. Undoubtedly, one of those specifics is the defendant's willingness to take the stand and lie. Such conduct not only demonstrates a disrespect for the law and the judicial system, but also evidences an important character trait. It reveals that the defendant is perfectly willing to commit a crime in an attempt to conceal an earlier crime. It is most assuredly a probative and important piece of information to consider when evaluating a defendant's prospects for rehabilitation.

■ A sentencing judge has an affirmative duty to treat each defendant on an individual basis, and to focus on that defendant's unique background and character. *Taylor v. Howard,* 111 R.I. 527, 304 A.2d 891 (1973). When considering whether a particular defendant can successfully regain his or her place in society, we do not think a trial justice can overlook a willingness to lie under oath. "A defendant's truthfulness or mendacity while testifying on his own behalf, almost without exception, has been deemed probative of his attitudes toward society and prospects for rehabilitation * * *." *United States v. Grayson,* 438 U.S. 41, 50, 98 S.Ct. 2610, 2616, 57 L.Ed.2d 582, 590 (1978). We think the trial justice was not in error in considering the defendant's willingness to lie un-

itsky, including her demeanor and the context in which her answers were made, was satisfied

that she had recognized defendant's voice. We are equally satisfied.

der oath as one factor to be taken into account in sentencing.

Accordingly, the appeal of the defendant Giulio Bertoldi is denied and dismissed. The judgment appealed from is affirmed. The papers in this case may be remanded to the Superior Court.